**H. Max AMMERMAN et al., Appellants,**

**v.**

**Lou MILLER et al.**

**No. 22892.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 23, 1970.

Decided June 17, 1970.

---

Mr. Paul R. Connolly, Washington, D. C., with whom Mr. J. Alan Galbraith, Washington, D.C., was on the brief, for appellants.

Mr. Bernard I. Nordlinger, Washington, D.C., with whom Mr. John J. Cooleen, Washington, D.C., was on the brief, for appellee.

Before McGOWAN, Circuit Judge, MacKINNON, Circuit Judge, and MATTHEWS,* Senior District Judge.

PER CURIAM:

H. Max Ammerman and Josephine Ammerman, his wife, filed a complaint[1] against Lou Miller in the United States District Court for the District of Columbia seeking rescission and cancellation of two promissory notes and return of monies paid on one of such notes, and alleging as grounds therefor mistake and failure of consideration. This appeal challenges the District Court's dismissal of the complaint for failure to state a claim upon which relief can be granted.

H. Max Ammerman and Lou Miller are hereinafter called by their respective surnames.

It appears that Daniel and Janice Melnick, Melvin and Dorothy Robinson, Jerry Wolman and Ammerman were partners in a Maryland real estate syndicate known as the Grigsby Joint Venture. On January 24, 1966, in return for value received from Miller the Melnicks gave to Miller their promissory note for $68,000, and assigned to him as collateral their twelve and one-half percent "ownership interest" in the Grigsby Joint Venture. The Robinsons also gave an identical note and assignment to Miller.[2]

Ammerman and Wolman, as remaining partners, consented to the Melnick and Robinson assignments on January 24, 1966 in documents entitled "Consent by Remaining Joint Venture[r]s", hereinafter called Consent Agreements, one such document being appended at the end of each assignment. In the Consent Agreements, identical for each assignment, Ammerman and Wolman also agreed in the event the Melnicks' and Robinsons' notes were not paid at maturity to purchase the 25 percent joint venture interests acquired by Miller under the collateral assignments, and to pay therefor the face amount of the defaulted notes.[3]

At maturity on January 25, 1967, neither the note of the Melnicks nor the note of the Robinsons was paid. Miller made demand upon them for payment as

---

\* Sitting by designation pursuant to 28 U.S. C. § 294(c) (1964).

1. The complaint is in fact an amended one filed before answer without leave of court under Fed.R.Civ.P. 15(a).

2. In each assignment the Assignors "hereby set over, assign, and convey unto the Assignee [Miller], as collateral and for security purposes, their twelve and one-half (12½%) percent ownership interest in the Grigsby Joint Venture, a Maryland Joint Venture, originally formed pursuant to a Joint Venture Agreement executed on the 15th day of April, 1963, which Joint Venture the Assignors hereby represent to be the owner of the Dodge Park

View Apartments Sections 1, 2 and 3, located in Prince George's County, Maryland."

3. The text of each consent agreement reads as follows:

"We the undersigned, being all of the remaining venture[r]s in the Grigsby Joint Venture, do hereby consent to the foregoing Collateral Assignment and, in addition, agree that in the event the Promissory note referred to in the Collateral Assignment is not paid at maturity, that upon thirty (30) days' written notice from the Assignee, we will purchase the Joint Venture interest for the face amount of the note."

well as upon Wolman and Ammerman as signatories to the Consent Agreements. This demand was in a letter from Miller's attorney to Wolman with a copy to Ammerman, the Melnicks and the Robinsons.[4]

It is alleged in the complaint that in making such demand upon Ammerman, "Miller did not tender, or offer to tender, as required by the 'Consent Agreement[s],' the joint venture interests he had received from the Melnicks and Robinsons in the Grigsby Joint Venture under their respective collateral assignments." [5]

Ammerman with Jerry and Ann Wolman executed and delivered a promissory note to Miller payable in ninety days, dated March 15, 1967, the face amount being $136,000 which was the total amount of the defaulted Melnick and Robinson notes. In the complaint it is asserted that the execution of this $136,000 note was without consideration and was based upon a mistake of fact, in that Ammerman and also Miller were under the mistaken assumption that Ammerman and Jerry Wolman had uncondi-

tionally guaranteed the defaulted Melnick and Robinson notes.[6] Ammerman maintains that under the consent agreements he and Wolman were to purchase the 25 percent joint venture ownership interests acquired by Miller under the collateral assignments, and to pay therefor the face amount of the defaulted notes, and that when the $136,000 note was delivered to Miller they (Ammerman and the Wolmans) did not receive in return the joint venture ownership interests which had been assigned to Miller by the Melnicks and the Robinsons.

On December 30, 1967, Miller endorsed and delivered to Ammerman the March 15, 1967 note for $136,000, and Ammerman and his wife together executed and delivered to Miller a new promissory note in the place of the note of March 15, 1967. The Ammermans made payments to Miller on the note of December 30, 1967 totalling approximately $30,000. It is alleged in the complaint that the execution of the December 30, 1967 note was without consideration and was based upon a mistake of

4. The demand part of the letter reads:

"Unless the matter of the payment of the above notes is resolved by Noon, February 23, 1967, I shall have no alternative but to file suit against Mr. and Mrs. Melvin A. Robinson, Mr. and Mrs. Daniel Melnick, makers of the above notes, and you and H. Max Ammerman, Esquire, signatories to the agreement dated January 24th, 1966."

5. In addition the Ammermans allege that they "are now informed and believe" that Miller could not at the time of his demand or at any subsequent time make a tender of such joint venture ownership interests for the following reason: Miller "did not record the collateral assignments he had received in the Grigsby Joint Venture." A bank, "which had no knowledge of the collateral assignments, obtained a judgment against the Melnicks and Robinsons and recorded its judgment lien against their interests of record in the Grigsby Joint Venture. The bank's judgment exceeded the worth of the Melnicks' and Robinsons' interests of record, and its recorded judgment lien, entitled to priority, destroyed the value of the unrecorded collateral assignments held by * * *

Miller. Thus * * * Miller could not tender to * * * Ammerman the joint venture interests he had obtained, but failed to protect, from the Melnicks and Robinsons. Since the 'Consent Agreement[s]' require a proper tender, a condition precedent * * * Miller could not fulfill, * * * Ammerman's duty to pay for that which was to be tendered never arose."

6. It is also alleged in the complaint that Ammerman was not given and did not make a copy of the Consent Agreements at the time he signed them in January 1966, that no copies thereof were enclosed in Miller's demand letter of February 15, 1967 following default on the Melnick and Robinson notes, and that Ammerman did not request to see and was not shown the Consent Agreements because for a period of time he mistakenly believed himself to be obligated as a guarantor of the Melnick and Robinson notes on the basis of Miller's demand letter and on the basis of statements by Jerry Wolman, the other signatory of the Consent Agreements. The demand letter indicates that prior thereto Miller's attorney had written to and conversed with Wolman.

fact in that the Ammermans and also Miller, still mistakenly assumed (as in the execution of the March 15, 1967 note) that Ammerman had unconditionally guaranteed the defaulted notes of the Melnicks and Robinsons.

The final allegations of the complaint are that in the following year (1968), about March 15, Miller endorsed and delivered to Ammerman the promissory notes of the Melnicks and Robinsons; that upon discovery by Ammerman's counsel, after investigation, that the terms of the Consent Agreements did not make Ammerman a guarantor of the Melnick and Robinson notes, Ammerman ceased making payments on the above mentioned note dated December 30, 1967 which he and his wife had given to Miller, and tendered back to Miller the Melnick and Robinson notes in exchange for his own note, co-signed by his wife; and that Miller refused said tender. This suit was instituted October 28, 1968.

In support of his contention that the dismissal of the complaint was proper, Miller argues that from the complaint an inference arises that upon delivery to him of the $136,000 note, Ammerman and Wolman *"made an election * * * to acquire the Melnich and Robinson notes * * *."* (Emphasis supplied.) On this premise, Miller asserts that ample consideration is shown in the complaint for the delivery to him of the $136,000 note of March 15, 1967 and the note of December 30, 1967.

We do not feel, however, that we may rightly draw the suggested inference. On appeal from the dismissal of a complaint for failure to state a claim upon which relief can be granted, this court must accept the plaintiffs' material allegations of fact as true. Gardner v. Toilet Goods Assn., 387 U.S. 167, 172, 87 S.Ct. 1526, 18 L.Ed.2d 704, (1967). Murray v. City of Milford, Conn., 380 F.2d 468 (2d Cir. 1967). The complaint nowhere states that Ammerman and Wolman purchased or elected to purchase the defaulted notes, or that they received the defaulted notes at the time they delivered to Miller their $136,000 note. To the contrary, Ammerman asserts in the complaint that under the mistaken assumption that he and Wolman had guaranteed the payment of the defaulted Melnick and Robinson notes, they executed and delivered their promissory note for $136,000 to Miller (without a prior tender by Miller of the 25 percent joint venture ownership interests assigned to Miller by the Melnicks and the Robinsons). Clearly, therefore, we cannot infer, as suggested by Miller, that Ammerman and Wolman on March 15, 1967 elected to acquire the defaulted notes. Moreover, whether an election was made is a factual issue, and factual issues are not to be determined upon a motion to dismiss. Scozzafava v. United States, 199 F.Supp. 43 (S.D.N.Y.1961).

A memorandum by the District Court reflects to some extent the grounds of its dismissal of the complaint. After stating that "Ammerman * * * asserts that he gave his note [of March 15, 1967] only because he made a mistake as to the nature of his obligation," the Court declared that in the "absence of allegations of fraud or misrepresentation, mistake is insufficient", citing Bank of United States v. Daniel, 12 Pet. 30, 56, 9 L.Ed. 989 (1838).

In Bank of United States v. Daniel recovery was sought of ten percent damages paid to a bank on a bill of exchange pursuant to a Kentucky statute which all the parties mistakenly believed to be applicable, the statute at that time not having been judicially interpreted. The Supreme Court regarded the mistake as one of law, and not remediable under the circumstances of the case. The Court said that the parties "were perfectly aware of the facts", that no "fraud, imposition, or undue advantage" was involved, that the parties believed "the ten percent damages were due by force of the statute", that though the statute was

inapplicable,[7] nevertheless, by commercial usage the bank was "entitled to re-exchange [damages] when protest for non-payment was made", that the parties themselves having liquidated the damages, the court, in the absence of proof to the contrary, regarded the ten percent paid as fair compensation, and "the equities of the parties * * * equal." 12 Pet. 55, 56. Furthermore, the court said that the statute of limitations was a bar to recovery.

The District Court's memorandum in this case makes no express reference to a mistake of law. However, in citing Bank of United States v. Daniel, a case relating only to a mistake of law, the District Court may have deemed the mistake alleged by the Ammermans to be one of law.

Chief Justice Marshall, speaking for the Supreme Court in the reversal of a lower court for sustaining a demurrer to a complaint alleging a mistake of law, said:

> "Although we do not find the naked principle, that relief may be granted on account of ignorance of law, asserted in the books, we find no case in which it has been decided, that a plain and acknowledged mistake in law is beyond the reach of equity." Hunt v. Rousmanier's Adm'rs, 8 Wheat. 174, 21 U.S. 174, 215, 5 L.Ed. 589 (1823).

Both Bank of United States v. Daniel and Hunt v. Rousmanier's Adm'rs, *supra,* are early cases. It is now well recognized that equity may, and often will, permit obligations to be reformed or rescinded because based upon a mistake of law even though no fraud or misrepresentation is involved. Cincinnati, I. & W. R. Co. v. Indianapolis Union Ry. Co., 36 F.2d 323, 324 (6th Cir. 1929); Philippine Sugar Estates Development Co. v. Philippine Islands, 247 U.S. 385, 389, 38 S.Ct. 513, 62 L.Ed. 1177 (1918); In re Smith-Flynn Commission Co., 292 F. 465, 471 (8th Cir. 1923).

However, in their complaint the Ammermans describe the mistake they allege as a mistake of fact. Similar mistakes have been treated as factual. For example, in Mid-Continent Petroleum Corporation v. Sawyer, 236 F.2d 518 (10th Cir. 1956), an oil company, believing that an oil and gas lease required it to drill a well, entered into a compensatory royalty agreement in lieu thereof. Upon discovery that the lease did not require the drilling of a well, the oil company brought suit to recover the money paid under the agreement. Judgment was for the company "based on a finding that the agreement was entered into and payments made by Mid-Continent under an honest mistake of material fact, to the effect that it would not have entered into the [compensatory royalty] agreement or made the payments if it had known that the lease in question contained unusual provisions relieving it of the obligation to drill the well in lieu of which the compensatory royalty was paid." Judge Murrah, speaking for the court, said:

> "Doubtlessly, Mid-Continent officials who negotiated the compensatory agreement negligently failed to examine or inform themselves of the exonerating provisions in the lease. But even so, restitution, based on mistake of fact, will not be denied because of forgetfulness of once known facts or negligent failure to ascertain the true facts. Couper v. Metropolitan Life Ins. Co., 250 Mich. 540, 230 N.W. 929; Pingree v. Mutual Gas Co., 107 Mich. 156, 65 N.W. 6; Franklin Life Ins. Co. v. Ward, 237 Ala. 474, 187 So. 462; Restatement Restitution, § 16, p. 70. Indeed, the essence of the equitable doctrine of restitution for mistake of fact is frequently founded in 'unconscious ignorance' or forgetfulness of material facts which could have been remedied by the exercise of due care. Pomeroy Equity Juris., § 839; 40 Am. Jur., Payment, §§ 187, 194, 195, 197; Restatement Restitution, § 18, p. 82; §

---

7. This was because both drawer and acceptor were of Kentucky and the transaction took place there, though the bill was payable elsewhere.

19, p. 86; 70 C.J.S. Payment § 157, p. 366 et seq. The evidence amply supports the trial court's findings of honest mistake of a material fact in the consummation of the compensatory agreement." 236 F.2d 521.

■ Under the criteria stated by the Supreme Court "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed. 2d 80 (1957).

Referring to a motion to dismiss it was said in United States v. Thurston County, Neb., 54 F.Supp. 201, 204 (D.C. Neb.1944), affirmed 149 F.2d 485, (8th Cir.), cert. denied, 326 U.S. 744, 66 S.Ct. 58, 90 L.Ed. 444 (1945):

> "Such a motion no longer tests whether the complaint affirmatively states a cause of action. The rule is that it should be denied, though the complaint be infirm, if it is reasonably conceivable that at the trial upon the merits the plaintiff might establish a cause of action. [Citing cases] The cause of action must be proved by evidence on the trial. It need not necessarily be averred with precision in the complaint. So, a complaint may be invulnerable to a motion to dismiss for failure to state a claim upon which relief can be granted, and in the same case, the action may be dismissed on the merits at the trial for failure to establish a cause of action, even though every fact formally pleaded in the complaint be proved. The evidence on final submission is tested more critically than the pleading, when confronted by [a] motion to dismiss. Finally, in the ruling on a motion to dismiss, doubt should ordinarily be resolved against the motion; whereas, upon trial on the merits, doubt usually inclines the scale adversely to him who has the burden of proof, or, upon the plaintiff's case, against him."

At a trial on the merits, the claim of the Ammermans may prove to be groundless, as contended by Miller. But as was stated by Mr. Justice Brandeis in Myers v. Bethlehem Shipbuilding Corporation, 303 U.S. 41, 51–52, 58 S.Ct. 459, 82 L.Ed. 638 (1938) "Lawsuits * * * often prove to have been groundless; but no way has been discovered of relieving a defendant from the necessity of a trial to establish the fact."

■ Assuming, as we must, for present purposes, that the facts alleged in the complaint are true, we cannot say that it appears to a certainty that the Ammermans would be entitled to no relief under any state of facts which could be proved in support of their claim. We think that the allegations of the complaint are sufficient to withstand the motion to dismiss.

Reversed.