**H. Max AMMERMAN et al.,**
**Appellants,**

**v.**

**Lou MILLER.**

**No. 71–2048.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 5, 1973.

Decided Oct. 26, 1973.

Rehearing Denied Nov. 21, 1973.

---

**1288**

J. Alan Galbraith, Brattleboro, Vt., for appellants.

Bernard I. Nordlinger, Washington, D. C., for appellee.

Before McGOWAN and MacKINNON, Circuit Judges, and BURNITA SHELTON MATTHEWS,* Senior United States District Judge for the United States District Court for the District of Columbia.

MATTHEWS, Senior District Judge:

This is the second appeal in this case. Mr. and Mrs. Ammerman, plaintiffs-appellants, first appealed from a District Court judgment dismissing their complaint on the ground that it failed to state a claim upon which relief could be granted. On that appeal this Court reversed, holding that the allegations of the complaint were sufficient to withstand defendant's motion to dismiss. Ammerman v. Miller, 139 U.S.App.D.C. 188, 432 F.2d 621 (1970).

After a trial on the merits, the District Court found against the Ammermans on their complaint for recission of two promissory notes on grounds of mistake and lack of consideration, and rendered judgment for Louis Miller, defendant-appellee, on his counterclaim for the balance allegedly due on the second of these notes.**

The present appeal by the Ammermans followed. They claim that the District Court, having found that Ammerman believed himself to be liable as a guarantor under pertinent documents, erred in not rescinding the Ammermans' December 30 note on the ground of mistake. They also assert that the District Court erred in concluding that the Ammermans, when they sold their interests in a joint venture, became liable to Miller, since the Ammermans received no money which belonged to Miller, and Miller had no contractual basis for interfering with the Ammermans' right to alienate their own interests. Further, the Ammermans contend that if the court correctly held them liable to Miller, the court erred in failing to reduce their liability because of Miller's usury.

## THE BACKGROUND

In the main the facts are not in dispute. The controversy is as to the legal consequences which flow from the facts. Hence a factual recital is indicated.

Jerry Wolman, H. Max Ammerman, Daniel Melnick, Melvin A. Robinson, and their respective wives, were venturers in a Maryland real estate venture pursuant to a written instrument designated as the Grigsby Joint Venture Agreement. The venturers acquired land in Prince George's County, Maryland, and built

---

* Sitting by designation pursuant to 28 U.S.C. § 294(c).

** The court filed a Memorandum Opinion, constituting its findings and conclusions. Joint Appendix, Vol. 1, pp. 3a–18a.

thereon the Dodge Park View Apartments. Their percentage participation was allocated as follows: the Ammermans, 42.5%; the Wolmans, 32.5%; the Melnicks, 12.5%; and the Robinsons, 12.5%.

In January 1966, Melnick and Robinson sought to borrow $125,000 from the defendant Louis Miller for personal purposes unrelated to the Grigsby Joint Venture. They offered Miller a "bonus" of $11,000 for the loan and an assignment of their ownership interests in the Grigsby Joint Venture as security. Miller indicated that he would make them the loan provided Ammerman and Wolman would agree to purchase the Grigsby ownership interest of the Melnicks and the Robinsons, to be assigned to Miller as security, in the event Melnick and Robinson defaulted on their promissory notes, and also provided Ammerman and Wolman would sign their notes.[1]

At the request of Melnick and Robinson, Ammerman and Wolman consented to the assignment of the Melnicks' and Robinsons' ownership interest to Miller,[2] and agreed that upon 30 days' written notice from Miller they would purchase from him the Melnick and Robinson ownership interests in Grigsby for the face amount of the promissory notes of the Melnicks and Robinsons if they were not paid at maturity.

All the documents intended to express the loan deal were drawn up by an attorney for Melnick and Robinson. Two promissory notes were prepared for $68,000 each, payable to Miller's order, dated January 24, 1966, with interest at the rate of 6% until paid, payable monthly, and the principal payable January 24, 1967, one note to be signed by Melnick and his wife, and the other by Robinson and his wife.[3]

Two identical instruments headed COLLATERAL ASSIGNMENT, were also prepared. By each Collateral Assignment, the borrower and his wife were thereby to

> "set over, assign and convey unto the Assignee, [Miller] as collateral and for security purposes, their twelve and one-half * * * percent ownership interest in the Grigsby Joint Venture, a Maryland Joint Venture, originally formed pursuant to a Joint Venture Agreement executed on the 15th day of April, 1963, which Joint Venture the Assignors * * * represent to be the owner of the Dodge Park View Apartments, Sections 1, 2 and 3, located in Prince George's County, Maryland."[4]

Ammerman's and Wolman's commitment was set forth only in a writing known as *Consent By Remaining Venturers* (hereinafter *Consent Agreement*). At the end of the notarial acknowledgement of each of the above described COLLATERAL ASSIGNMENTS, the *Consent Agreement* appears as an appendage. In its entirety, it reads:

> "We, the undersigned, being all of the remaining Venturers in the GRIGSBY JOINT VENTURE, DO HEREBY CONSENT to the foregoing Collateral Assignment and, in addition, agree that in the event the Promissory Note referred to in the Collateral Assignment is not paid at maturity, that upon thirty (30) days' written notice from the Assignee [Miller], we will purchase the Joint Venture interest for the face amount of the note."[5]

---

1. Joint Appendix, Vol. 1, pp. 145a, 146a.

2. Under the venture agreement no venturer was to make disposition of his interest without the prior written consent of the other venturers or, in the absence of such consent, without first giving the other venturers an opportunity to purchase the interest on the same terms offered by the outside party. Plaintiffs' Ex. 1, pp. 10–11, par. 15.

3. Plaintiffs' Exs. 2 and 3.

4. Plaintiffs' Exs. 2A and 3A. Each Collateral Assignment provided that the Assignors would do such things as the Assignee (Miller) might specify for further assurances and in order to perfect the Collateral Assignment, and that upon payment of the promissory note the Assignee (Miller) would deliver to the Assignors such evidence of discharge of the aforesaid obligation and/or release thereof as the Assignors might require.

5. Plaintiffs' Exs. 2A, p. 3 and 3A, p. 3.

After these documents had been executed by the necessary parties, a meeting took place between Melnick, Robinson, Miller, and Samuel B. Block, an attorney representing Miller. The documents were read by Miller and his attorney [6] after which Miller took possession of them,[7] and later passed $125,000 in checks over to Melnick and Robinson.[8] The $11,000 difference between the $125,000 loaned and the combined face amount ($136,000) of the Melnick-Robinson promissory notes was regarded by Miller as his "profit" [9] or "bonus" [10] on the deal. Ammerman was unaware of this "bonus" at the time and believed that the value of the Melnick-Robinson joint venture ownership interests was about $136,000.

Although Miller had possession of the executed Collateral Assignments of the twenty-five percent ownership interests of the Melnicks and Robinsons in the Grigsby Joint Venture, he did not record the Assignments. Because of such failure, the Melnicks and Robinsons continued to appear of record as the holders of the interests they had conveyed to Miller as collateral and for security purposes.

The United Community Bank recorded a judgment lien, effective August 31, 1966, against the Melnicks and Robinsons in the amount of $123,200, plus costs and interest.[11]

Wolman was a substantial builder of apartments and office buildings in different areas. Running into a very difficult money market in the summer of 1966 and a resultant diminution in real estate sales, and with construction commitments not fully met, Wolman desired to work out his problems by effecting sales of property in which he had an interest.

Wolman had a prospect, Investors Funding of New York, interested in acquiring several thousand apartment units. Hence Wolman sought to purchase all of the Ammerman interests in several separate ventures. This led to an agreement between the Wolmans and the Ammermans for the sale or trade or transfer to Wolman or his nominee of the Ammerman interests in four ventures, including Grigsby,[12] the terms for the different venture interests being separately stated.

As to the Ammerman interests of 42½ percent in Grigsby, such agreement dated September 20, 1966, provided:

"[1.] For all of their interests in the Dodge View properties, Wolman shall make no payment to said Ammermans, but the sum of $295,000.00 in cash shall be paid to the *Grigsby Limited Partnership* and Ammermans shall cause a conveyance of their interest to Wolman." (Emphasis supplied.) [13]

6. Joint Appendix, Vol. 1, pp. 160a–161a.

7. *Id.* at pp. 165a, 205a, 206a.

8. *Id.* at p. 164a.

9. *Id.* at pp. 147a–148a.

10. *Id.*

11. Plaintiffs' Exs. 16A, B and C.

12. Defendant's Exs. 19 and 19A.

13. As of this time Ammerman had invested $100,000 of his own money in the Grigsby Joint Venture. And pursuant to the Grigsby Joint Venture Agreement of 1963 (Plaintiffs' Ex. 1, par. 7) Ammerman had obtained for the venture a loan of $300,000 in cash from individuals who became limited partners in the *Grigsby Limited Partnership.* As such they were not subject to calls for contributions to the venture. The mentioned loan of $300,000 to the venture carried no interest. The principal was payable at the rate of $30,000 yearly, beginning April 30, 1964. For this loan of $300,000 to the venture a note was given in that amount signed by all venturers (the Ammermans, Wolmans, Melnicks and Robinsons). Under the Venture Agreement the $300,000 indebtedness was to be secured by a deed of trust on the apartment project land which trust by its terms was to be subordinate to the purchase money ground trust of $500,000 which had been put on the land in order to purchase the interest of Nick Basiliko in the contract to acquire the land, to provide purchase money funds and additional working capital to the venture. The $300,000 note and deed of trust to secure the same were executed by all record title holders (Plaintiffs' Exs. 9 and 9–A), this being prior to the loan transaction between Miller and the Melnicks and

"[2.] Wolman will convey to sa.. Ammermans a one-half undivided interest in and to property described as Dodge View Park, subject to a mortgage secured thereon in the approximate balance sum of $200,000.00, said property being unimproved land." [14]

On October 16, 1966, Mr. and Mrs. Wolman entered into an agreement with Melnick and Robinson and their respective wives whereby the Melnicks and Robinsons agreed to sell and Mr. and Mrs. Wolman agreed to buy "all of the Sellers' Joint Venture Ownership Interest" in the Grigsby Joint Venture.[15] The purchase price was stated as $75,000 in cash. The "vacant land" [16] was excluded from the contract.

Wolman knew that the Melnick-Robinson joint venture interests were already pledged to Miller but was assured by Melnick and Robinson that Miller was no problem and that they would work out matters with him.

However, Melnick and Robinson did not advise Miller that they intended conveying their joint venture interests to the Wolmans. They did ask Miller to accept the $75,000 which they expected to receive from Wolman under the last-mentioned agreement. In the promissory notes which the Melnicks and Robinsons had given to Miller and which were not due until 1967, they had reserved "the right of prepayment of part or all of the principal sum, at any time and from time to time, without penalty." [17]

But their proposal to Miller for prepayment of the $75,000 seems to have contemplated a refinancing of the rest of their indebtedness to him and it did not materialize.

While attempting to acquire all outstanding ownership interests in the Grigsby Joint Venture, Wolman learned of the recordation by the United Community Bank of its judgment lien in the amount of $123,200 against the Melnicks and Robinsons. Realizing that this judgment lien would have to be lifted before he could convey to his outside buyer a clear title to the Dodge Park View Apartments, Wolman obtained a release of the judgment lien by paying the United Community Bank $11,500, and personally guaranteeing the payment of an additional $40,000 [18] which later was paid.[19] The release of the judgment lien was filed November 25, 1966.[20]

Wolman made settlement with the Ammermans under his agreement with them of September 20, 1966, and with the Melnicks and Robinsons under the agreement with them dated October 16, 1966.

Having agreed to sell the land and premises constituting the Dodge Park View Apartments to an outside buyer and to avoid a series of conveyances, Wolman had a single deed prepared to convey said land and premises to CH #13, a Maryland corporation, acting as nominee for his outside buyer, the deed to be signed by all record title holders as

---

Robinsons. Wolman and Ammerman individually guaranteed the payment of the $300,000 indebtedness while the liability of the Melnicks and Robinsons thereon was limited to recourse against the land and premises securing said indebtedness.

14. This provision seems to contemplate that after Wolman acquires all interests in this land (including the Ammerman interests) he will then convey one-half thereof to Ammerman. At some time subsequent to the agreement between Wolman and the Ammermans a foreclosure took place under the $200,000 trust and the party secured bought the land in for $35,000.

15. Plaintiffs' Ex. 15.

16. This vacant land is the same land which Wolman had agreed to convey to the extent of a one-half interest therein to Mr. and Mrs. Ammerman in his agreement with them.

17. Plaintiffs' Exs. 2 and 3.

18. Plaintiffs' Ex. 17.

19. Joint Appendix, Vol. 1, p. 122a.

20. See "Order of Release" in Plaintiffs' Ex. 16.

grantors.[21] Thereafter at Wolman's request, the Ammermans executed the conveyance. The Melnicks and Robinsons along with the Wolmans collectively held all the remaining interests in the record title to the Dodge Park View Apartments. When they also executed the deed to CH #13, Miller lost his unrecorded security.

Miller learned of the conveyance. Early in January 1967, his attorney sent identical letters to the Melnicks, Robinsons, Ammerman and Wolman demanding payment of the Melnicks' and Robinsons' promissory notes [22] on the ground that the collateral given to secure them had been disposed of.

Shortly thereafter the Melnicks and Robinsons defaulted on their notes, and Miller's attorney made a further demand on Wolman, the Melnicks, Robinsons and Ammerman for payment.[23] Believing they had unconditionally guaranteed the payment of these notes, Ammerman and Wolman deemed themselves obligated to respond to the demand made upon them by Miller's attorney to pay.[24]

However, because late in the year 1966 Ammerman had agreed to sell to Wolman all of the Ammermans' ownership interests in the Joint Venture, both Ammerman and Wolman as between themselves regarded it as Wolman's responsibility to satisfy the demands of Miller's attorney.[25]

Miller's attorney discussed the obligation with both Wolman and Ammerman.[26] He then prepared a proposed note.

Accordingly, Wolman and his wife signed this note dated March 15, 1967, for $136,000 payable to Miller. Wolman sent the note to Ammerman along with a letter[27] following which Ammerman also signed the note. It was for ninety days but was not paid at maturity. For some time the matter drifted along while Wolman assiduously worked on deals from which he expected to realize funds with which to take up the note of March 15, 1967, and to solve other financial problems. But on December 12, 1967, Wolman and his wife filed an application to declare bankruptcy under Chapter 11 of the Bankruptcy Act.

Thereafter on December 30, 1967, Ammerman gave Miller a new note, co-signed by his wife, in exchange for the note of March 15, 1967. This new note was for $142,460, taking into account accrued interest, this being the note on which Miller's counterclaim is based.

Late in 1967 Ammerman engaged an attorney in an effort to collect the defaulted notes of the Melnicks and Robinsons. Miller had endorsed these notes to Mr. and Mrs. Ammerman and delivered them after he had received the Ammerman-Wolman note of March 15, 1967.

In Maryland litigation on the Melnick-Robinson notes, Ammerman's attorney obtained a copy of the *Consent Agreement*. Following discovery of the content of the *Consent Agreement*, and in light of his attorney's opinion that under that document Ammerman had no liability to Miller, Ammerman tendered to Miller the Melnick and Robinson notes in exchange for the Ammermans' note of December 30. Miller refused the tender, and the instant action followed.

I

THE NATURE OF AMMERMAN'S
OBLIGATION

In the complaint Ammerman asserts that he and Wolman believed that they had unconditionally guaranteed payment of the Melnick-Robinson notes until an attorney for Ammerman in mid-year

21. Defendant's Ex. 1.

22. Defendant's Exs. 2, 3, 4, 5.

23. Defendant's Ex. 6.

24. Opinion of the Court, Joint Appendix, Vol. 1, p. 7a. See also the Joint Appendix, Vol. 1, at pp. 42a, 85a, 124a, 125a, 134a.

25. Joint Appendix, Vol. 1, pp. 125a, 126a.

26. Joint Appendix, Vol. 1, pp. 126a, 127a, 199a.

27. Defendant's Ex. 9. The letter is hereinafter quoted.

1968 obtained a copy of one of the *Consent Agreements* and advised Ammerman that in his opinion these documents did not make Ammerman a guarantor. Consequently in his complaint Ammerman asked for a declaration by the court that plaintiffs are under no financial obligation to defendant Miller.

The nature of Ammerman's undertaking rests upon the *Consent Agreements,* read in the light of the surrounding circumstances. Myers v. Myers, 153 Md. 44, 137 A. 501 (1927).

Miller had known Melnick and Robinson many years and Mrs. Melnick is his cousin. Nevertheless, when Miller was propositioned by Melnick and Robinson about a loan, Miller made it plain that he wanted more protection than they were offering. At trial Miller testified that he told them he "wanted Jerry Wolman and Max Ammerman's name on that note and in case there were any problems, [he] wanted them to buy out [his] interest."[28] In a pretrial deposition Miller said he desired "that Jerry Wolman and Max Ammerman sign an agreement that in the event that [the Melnick-Robinson notes were] in default Jerry and Max would buy out [his] interest."[29] Ammerman and Wolman were not present at any of the negotiating sessions. With papers drawn up by their attorney, Melnick and Robinson went to Ammerman and Wolman and obtained their signatures on the *Consent Agreements,* but not on the Melnick-Robinson notes.

■ The trial court held that Ammerman's obligation was "something less than an unconditional guaranty."[30] We agree. We think that Ammerman was a conditional guarantor in that he obligated himself in the event the Melnick-Robinson notes were not paid at maturity, and upon thirty days' written notice from Miller, to purchase the joint venture interest assigned to Miller as security and to pay Miller therefor the face amount of the Melnick-Robinson notes.

■ A contract of guaranty is "a promise to pay or an assumption of performance of some duty upon failure of another who is primarily obligated in the first instance." Pavlantos v. Garoufalis, 89 F.2d 203, 205–206 (10th Cir. 1937). See also 38 C.J.S. Guaranty § 1.

■■ Contracts of guaranty are divided into two kinds. "One is absolute or unconditional and the other is conditional. An absolute guaranty is an unconditional undertaking on the part of the guarantor that the person primarily obligated will make payment or will perform, and such a guarantor is liable immediately upon default of the principal without notice. A conditional guaranty is an undertaking to pay or perform if payment or performance cannot be obtained from the principal obligor by reasonable diligence." Pavlantos v. Garoufalis, *supra,* at p. 206. See also Hodgson v. Burroughs, 175 Md. 413, 2 A.2d 407 (1938).

■ Like every other contract, a contract of guaranty can only be made by the mutual assent of the parties. Since the guaranty by Ammerman and Wolman was made at the request of Miller, the guaranty became the answer of Ammerman and Wolman to Miller's proposal, and its delivery to Miller or for his use completed the communication between them and constituted a conditional contract of guaranty. Davis v. Wells, 104 U.S. 159, 26 L.Ed. 686 (1881). The consideration to Ammerman and Wolman for this guaranty (the *Consent Agreements*) was the loan from Miller to the Melnicks and Robinsons. Lutz v. Porter, 206 Md. 595, 112 A.2d 480 (1954). But for this guaranty Miller would not have made the loan.

## II

### THE ABSENCE OF TENDER

It stands without contradiction that Miller made no tender to Ammerman of the Grigsby Joint Venture ownership interests assigned to him by the Melnicks

---

28. Joint Appendix, Vol. 1, p. 145a. See also p. 156a.

29. *Id.* at p. 179a.

30. *Id.* at p. 9a.

and Robinsons. Ammerman's position is that the *Consent Agreements* required a proper tender, a condition precedent Miller did not fulfill; that, therefore, Ammerman's duty to pay for that which was to be tendered never arose; and hence that there was a failure of consideration for the note of March 15, and the note of December 30, 1967, entitling Ammerman to their cancellation.

■ We have already pointed out that Ammerman and Wolman received consideration for their guaranty, this being the loan made by Miller to the Melnicks and Robinsons. The Wolman-Ammerman note of March 15 was their response to Miller's demand on them as guarantors. But this does not settle the question of Miller's obligation to tender the security he received for the loan, i. e., the Melnick-Robinson interests in the Joint Venture.

The rationale of the District Court was that Miller's failure to make tender to Ammerman of the Melnick-Robinson Joint Venture interests was excusable because brought about by actions in which Ammerman "participated and had the legal power to prevent." [31] These actions included the joinder of the Ammermans with all the other joint venturers as grantors in the deed whereby the total interests in the Dodge Park View Apartments—the main asset of the Grigsby Joint Venture—were transferred to a corporation with the result that the security theretofore conveyed to Miller by the (unrecorded) Collateral Assignments was put beyond Miller's reach, and his power to tender such security to Ammerman in case of default of the Melnicks and Robinsons was destroyed.

At the time the Dodge Park View Apartments were sold and transferred to the corporation the Melnick-Robinson notes held by Miller had not matured, and Ammerman knew or should have known, that the Collateral Assignments given with his consent to Miller by the Melnicks and Robinsons were outstanding.

The Grigsby Joint Venture Agreement contained a provision against the disposition by a venturer of all or any of his joint venture interest without the previous written consent of the other joint venturers. Ammerman might have utilized this provision to prevent the Melnicks and Robinsons from further disposition of their joint venture interests which were already assigned to Miller. By not preventing such transfer, Ammerman permitted it with the resultant destruction of the interests by which Miller was secured.

Deeply rooted in our jurisprudence is the rule applied by the District Court herein as enunciated in Coastal Oil Co. v. Eastern Tankers Seaways Corp., 29 N. J.Super. 565, 103 A.2d 26 (1954) as follows:

> "It is well established as a principle of fundamental justice that if a promisor prevents or hinders the occurrence or fulfillment of a condition in a contract, and the condition would have occurred or would have been fulfilled except for such hindrance or prevention on the part of the promisor, then the performance of the condition is excused and the liability of the promisor is fixed regardless of failure to fulfill the condition." 103 A.2d 32.

See also United States v. Peck, 102 U. S. 64, 26 L.Ed. 46 (1880); Gulf Oil Corporation v. American Louisiana Pipe Line Co., 282 F.2d 401 (6th Cir. 1960); Tradewell Foods v. New York Credit Men's Adj. Bur., 179 F.2d 567 (2nd Cir. 1950); Restatement of Contracts §§ 294, 295 (1932); 5 S. Williston, Contracts § 677 (3rd ed. 1961); 17A C.J.S. Contracts § 468b (1963).

■ Furthermore, the record establishes that when Miller's attorney demanded payment from Ammerman and Wolman of the Melnick-Robinson notes before their maturity, the demand was squarely grounded on the *disposition* of the Melnick-Robinson Joint Venture interests by which Miller had been secured. Ammerman and Wolman were

---

31. Joint Appendix, Vol. 1, p. 11a.

fully cognizant of that disposition as they themselves had been parties to the instrument by which the disposition was accomplished. Prior to giving any promissory note to Miller, Ammerman and Wolman were on notice from Miller's attorney that his demand on them for payment of the Melnick-Robinson notes rested on the disposition of the joint venture interests which, with their consent, had been assigned to Miller. Even assuming that Ammerman gave his notes under a mistaken theory, still he would not be entitled to rescission or restitution if it were not inequitable for Miller to retain the benefit. See Restatement of Restitution § 61 (1937). *Cf.* Sawyer v. Mid-Continent Petroleum Corp., 236 F.2d 518, 521 (10th Cir. 1956).

■■ The relief sought by the Ammermans—the rescission or cancellation of their promissory notes—is ordinarily considered to be exclusively equitable in nature. The allowance or denial of rescission rests in the sound discretion of the trial court. In determining whether rescission should be granted or refused in a particular case, the trial court exercises its discretionary power in light of what is just and reasonable under all the surrounding circumstances, and in the main proceeds on the general principles of equity jurisprudence. 12 C.J.S. Cancellation of Instruments §§ 2, 3.

■ We cannot say that the District Court abused its discretion in ruling that Miller was excused from making tender and that lack of tender did not entitle the Ammermans to cancellation of their notes.

### III

### DUTY OF CREDITOR TO RECORD ASSIGNMENTS

The Ammermans also assert that they had every right to convey their own interest in the Dodge Park View Apartments; that Miller lost his security, not because the Ammermans conveyed their interest, but because the Melnicks and Robinsons could and did convey their interests as Miller had failed to record his collateral assignments.

We read the trial court's opinion as holding that Miller had no duty to record the Collateral Assignments. We cannot subscribe to that position.

■ The general rule is that if a creditor receives a mortgage, deed of trust, assignment, or similar conveyance of property of the debtor as security for the debt, knows of the guarantor's obligation, and the recording of such conveyance is necessary so as to make it valid against subsequent judgment creditors and purchasers, it is the duty of the creditor to see that the instrument in his hands is properly recorded, and if he fails to act, the guarantor will be discharged to the extent of the loss thereby occasioned. D. W. Jaquays & Co. v. First Security Bank, 101 Ariz. 301, 419 P.2d 85 (1966); First Nat. Bank v. Kittle, 69 W.Va. 171, 71 S.E. 109 (1911); Sullivan v. State, 59 Ark. 47, 26 S.W. 194 (1894); 50 Am.Jur., Suretyship, § 118; Restatement of Security § 132, p. 358 (1941); A. Stearns, Suretyship § 99, p. 142 (4th ed. 1934); 1 G. Brandt, Suretyship and Guaranty, § 505 (3rd ed. 1905). *Cf.* Etelson v. Suburban Trust Company, 263 Md. 376, 283 A.2d 408 (1971).

■ It is undisputed that at all pertinent times the Collateral Assignments were in the exclusive custody and control of Miller. Therefore as to them he was bound to exercise good faith and reasonable care.[32]

■ We think it was Miller's duty to record the Collateral Assignments. Had he done so, likely this litigation would never have arisen. Recordation would have been constructive notice to all subsequent judgment creditors and

---

32. Miller was aware of his recording rights. When asked why he did not record the Collateral Assignment Miller responded: "I just didn't record it." After this answer the Court Reporter added: "(Witness laughs)." Joint Appendix, Vol. 1, pp. 186a, 187a.

purchasers, and this would have preserved the joint venture interests assigned to Miller.[33]

 We regard the Collateral Assignments here involved as qualifying for recordation under the Annotated Code of Maryland 1957, Art. 21, § 26 (1966 Replacement Volume).[34] It provides:

> "Every bond, writing obligatory or contract for the conveyance of real estate, or any interest or estate of, in, or relating to real estate, * * * may be executed, acknowledged and recorded in the same manner as deeds of real estate * * *."[35]

Each Collateral Assignment given to Miller described the Dodge Park View Apartments owned by the Grigsby Joint Venture sufficiently for identification purposes, used language appropriate to conveyancing, and was executed by the assignors in the same manner as a deed, that is to say, each was signed, sealed, attested by one witness, and acknowledged before a Notary Public. Ann.Code of Md.1957, Art. 21, §§ 5, 6, 12, 68, 82, 84, 85 (1966 Replacement Volume).

Notwithstanding Miller's duty to record the Collateral Assignments, his failure to do so is of no consequence unless it occasioned injury or loss to Ammerman.

As already noted, the judgment obtained by the United Community Bank for $123,200 plus interest and costs against the Melnicks and Robinsons was recorded in August 1966.[36] The evi-

33. The District Court cited Joe Heaston Tractor & Imp. Co. v. Securities Accept. Corp., 243 F.2d 196 (10th Cir. 1957), (hereinafter *Heaston*), and Nation Wide, Inc. v. Scullin, 256 F.Supp. 929 (D.N.J.1966), aff'd 377 F.2d 554 (3rd Cir. 1967), as cases rejecting the contention that a creditor impliedly agrees to record instruments conveying to him property of the debtor as security. Joint Appendix, Vol. 1, p. 11a. In the case at bar the guaranty was conditional but in each of the cited cases the guaranty was absolute and unconditional. Further, in the instant case neither Ammerman, Wolman nor the Grigsby Joint Venture shared in the money Miller loaned. Conversely, the guaranty contract in each of the cited cases was given as an inducement to a finance company to extend financing to an enterprise or entity as to which the guarantor himself had a financial involvement. For example, in *Heaston*, the principal bought Heaston's store, assumed Heaston's indebtedness of $35,000, but needed financing to swing this project, and thereupon, Heaston, as an integral part of same, gave an absolute guaranty to the company furnishing such financing. Sued on their guaranty, defendants in the cited cases relied upon the rule of law set forth in 50 Am.Jur., Suretyship, § 118, asserting that the failure of the creditors to record the lien of security released them to the extent of the loss thereby sustained. After considering the guaranty contract as a whole, the purpose for which it was given together with all the surrounding circumstances existing at the time the guaranty was executed, the court in each cited case concluded that the guaranty involved was an absolute and unconditional one, intended to be so by all the parties, and hence that the mentioned rule did not apply.

34. Assuming *arguendo* that the Collateral Assignments needed something further to qualify for recordation under Maryland law, the Assignments themselves obligated the assignors to do whatsoever *Miller* might request to perfect such assignments.

35. Judge Soboloff for the court in Bourke v. Krick, 304 F.2d 501 (4th Cir. 1962), discussed the Maryland recordation statutes, including the one above quoted, stating in part at p. 503:
"The design of these statutes * * * is that 'all rights, incumbrances, or conveyances touching or in any wise concerning land should appear on the public records.' (Citation omitted.)
"Consistent with this broad purpose, the Maryland [C]ourt [of Appeals] has approved the recordation of easements, deeds of real property for the benefit of creditors, deeds of trust, leases, contracts of conveyance, restrictive covenants contained in deeds, drainage easements, option contracts pertaining to real property, as well as deeds of real property. In each instance, subsequent purchasers and creditors were held to have constructive notice of the recorded transaction."

36. Ammerman claimed that the bank's judgment exceeded the worth of the Melnicks' and Robinsons' interests of record in the Grigsby Joint Venture, and that such judgment, entitled to priority, destroyed the value of the unrecorded Assignments held by Miller.

dence reveals, however, that due to efforts and expense by Wolman this judgment was released of record in November 1966, *before* the Melnick-Robinson notes fell due, and prior to any demand whatever on Ammerman under his conditional guaranty, i. e., the *Consent Agreements*.

We conclude that under the circumstances Miller's failure to record the Collateral Assignments was not the cause of injury or loss to Ammerman.

## IV

### MILLER'S COUNTERCLAIM

#### *The Subrogation Issue*

In dispute here is the question of the subrogation right asserted by Ammerman, and opposed by Miller.

Ammerman contends that he and Wolman gave their note of March 15, 1967, for $136,000 to Miller in extinguishment of the instruments of guarantee which they then believed the *Consent Agreements* were, and that they thus became entitled by right of subrogation to the unpaid notes of the Melnicks and Robinsons.

On the other hand, Miller claims that Ammerman and Wolman *elected to purchase* from him the defaulted Melnick-Robinson notes totaling $136,000 and that the Ammerman-Wolman note of March 15, 1967, for $136,000 was given to him for such purchase.

The District Court did not articulate its views on the claimed right of subrogation. Indeed no mention is made in its opinion of the subrogation issue.

Early in its opinion the court found that Ammerman "regarded himself as a guarantor of the Melnick-Robinson notes in the amount of $136,000, and * * * when those notes were not paid at maturity and when demand was made upon him to pay, Ammerman gave his note to Miller in the amount of $136,000." [37] Yet later in the opinion the court concluded that Ammerman elected to purchase the Melnick-Robinson notes.[38]

The record contains no testimony supportive of such an election. However, a letter in evidence dated March 25, 1967, from Wolman to Ammerman, contains the two following sentences:

"I am enclosing the note for Sam Block, which represents the purchase price for the Robinson and Melnick note.

"I would appreciate your treating this as if we are both liable and sending whatever should be sent to Robinson and Melnick on our behalf, plus whatever concentrated effort you can make on getting some money from them, as they do nothing more than ignore me." [39]

Referring to the last above mentioned letter, the court said:

"This communication represents a decision by Wolman to purchase the Melnick-Robinson notes." [40]

As to Ammerman, the court held:

"He * * * bought the notes for their face amount by giving his note in an even amount. * * * *This election to purchase these notes by giving his own note does not make the defense of usury available to [Ammerman] on the counterclaim.*" (Emphasis added.) [41]

At the trial Wolman was asked what he meant when he wrote Ammerman that he was enclosing a note for Sam Block representing the purchase price for the Robinson and Melnick note. Wolman replied:

"Sam Block told me that he couldn't get anywhere with Robinson and Melnick and that he would agree to take my note for their note, and that when I sent him my note back properly exe-

37. Joint Appendix, Vol. 1, p. 7a.

38. *Id.* at p. 18a.

39. Defendant's Ex. 9.

40. Joint Appendix, Vol. 1, p. 17a.

41. *Id.* at p. 18a.

cuted, he would return their notes to me." [42]

Wolman explained that he asked Ammerman to sign the March 15, 1967, note with him because by that time Block was not willing to take his signature alone.[43]

Ammerman in his testimony said:

"Well, Mr. Wolman is not an attorney. We were not purchasing Robinson and Melnick notes as I stated before. I believe[d] we had an obligation as guarantors and were entitled to the notes when we gave this note [for $136,000] for that obligation as a guarantor, we were entitled as a matter of law to these notes.

\* \* \* \* \* \*

"Once we paid the guarantee, we were entitled to whatever the guarantee was given for as a matter of law. That is why we got the [Melnick-Robinson] notes.

\* \* \* \* \* \*

"[W]e gave the note of March 15, 1967 in extinguishment of the guarantee of January, 1966, and we are entitled to the fruits of the guarantee, namely, the two notes [of] Melnick and Robinson, and we got them subsequently as I indicated to you before."[44]

The testimony of Mr. Block, Miller's attorney, clearly manifests that after Melnick and Robinson defaulted on their notes, Block's demands on Wolman and Ammerman were premised on their guaranty (the *Consent Agreements*). As in the case of other witnesses, the concept that Ammerman and Wolman elected to purchase the Melnick-Robinson notes, finds no support whatever in Block's testimony.[45]

Much has been written regarding the doctrine of subrogation. Mr. Justice Frankfurter for the Court in Amer. Surety Co. v. Bethlehem Bank, 314 U.S. 314, at pages 316 and 317, 62 S.Ct. 226, at page 228, 86 L.Ed. 241 (1941), referred to "familiar equitable doctrines evolved by the courts," and said that among

"the oldest of these doctrines is the rule of subrogation whereby 'one who has been compelled to pay a debt which ought to have been paid by another is entitled to exercise all the remedies which the creditor possessed against that other.' Sheldon, Subrogation (2d ed.) § 11."

Judge Edgerton stated the rule of subrogation for this Court in Amalgamated Casualty Ins. Co. v. Winslow, 77 U.S.App.D.C. 382, 384, 135 F.2d 663, 665 (1943):

"One who is compelled to pay a claim which another ought in fairness to pay is subrogated to the creditor's rights against him."

 Since the guaranty agreement herein was made in Maryland,[46] it is Maryland law that governs in determining a guarantor's right to subrogation as to all the creditor's rights against the debtor and the debtor's collateral.[47] It is appropriate that we turn to Orem v. Wrightson,[48] a leading Maryland case and in the law generally on the right accorded the subrogee.

Judge Brent, speaking for the Court in *Orem* stated:

"The doctrine of subrogation, or substitution as it is also termed, is a peculiar feature of equity. It is not founded in contract, but has its origin in a sense of natural justice. So soon as a surety pays the debt of the principal debtor, equity subrogates him to the place of the creditor, and gives him every right, lien, and security, to which the creditor could have resorted for the payment of his debt." [49]

---

42. *Id.* at p. 126a.

43. *Id.* at pp. 134a, 135a.

44. *Id.* at p. 85a.

45. *Id.* at pp. 199a, 210a.

46. The application of Maryland law is thoroughly discussed *infra*, in part V of this opinion.

47. Reconstruction Finance Corp. v. Maryland Casualty Co., 23 F.Supp. 1008 (D.Md.1938).

48. 51 Md. 34, 34 Am.Rep. 286 (1878).

49. *Id.* at 43, 34 Am.Rep. 288.

Recognizing the difficulty in laying down a general rule applicable to all cases in which subrogation is sought, the Maryland Court of Appeals has determined the essential elements of the legal right of subrogation to be: "(1) the existence of a debt or obligation for which a party, other than the subrogee, is primarily liable, which (2) the subrogee, who is neither a volunteer nor an intermeddler, pays or discharges in order to protect his own rights and interests. See 50 Am.Jur., [Subrogation], § 10; 83 C.J.S. Subrogation, §§ 3, 5. If these requirements are met, legal subrogation exists by operation of law without the consent of the creditor." [50]

It is noteworthy that in Maryland rights to subrogation are given by statute. The Maryland Code provides:

> "The surety in any bond or other obligation for the payment of money or promissory note, or the endorser of any protested bill of exchange, who shall pay or tender the money due thereon, whether the whole be due or part has been previously paid, shall be entitled to an assignment thereof; and may, by virtue of such assignment, maintain an action in his own name against the principal debtor." [51]

However, in Maryland a surety's right to subrogation exists independently of statute, this Act (originally enacted in 1763) [52] being merely declaratory of the common law. [53] The surety's right of subrogation is not limited to relations of a formal suretyship, but applies to all persons upon whom there is a fixed liability, whether surety, endorser, acceptor or guarantor, to pay a debt which was due, and which the principal debtor ought to pay. [54]

The District Court held that the letter from Wolman to Ammerman dated March 25, 1967, represented a decision by Wolman to purchase the Melnick-Robinson notes. True, in the first sentence of that letter Wolman did say that the enclosed note represented the purchase price for the Melnick-Robinson notes. However, this communication was not addressed to Miller but was exclusively between Wolman and Ammerman. The record does not even disclose when or how Miller became aware of it.

It is not particularly unusual that Wolman, a layman, should have expressed the transaction in terms of "purchase" of the "notes" when, in fact, *legal* writers have described the right of subrogation as in the nature of a purchase. For example, in the annotation to the case of Dering v. Earl of Winchelsea, 1 Leading Cases in Eq., 60 (m,) it was said:

> "Payment by one who stands in the relation of a surety, although it may extinguish the remedy or discharge the security, as respects the creditor, has not that effect as between the principal debtor and the surety. *As between them it is in the nature of a purchase by the surety from the creditor*; it operates an assignment in equity of the debt and all legal proceedings upon it, and gives a right in equity to call for an assignment of all securities; and, in favor of the surety, the debt and all its obligations and incidents, are considered as still subsisting." (Emphasis added.) [55]

Furthermore, in the second and last sentence of the same letter, Wolman requested that Ammerman treat the note as if they were both *liable*. Wolman's speaking of liability here seems strangely inappropriate language for one exercising a free election to purchase. Rath-

50. George L. Schnader, Jr., Inc. v. Cole Bldg. Co., 236 Md. 17, 23, 202 A.2d 326, 330 (1964).

51. Ann.Code of Md.1957, Art. 8, § 3 (1968 Replacement Volume).

52. Md.Laws of 1763, ch. 23, §§ 7, 8.

53. Watkins v. Worthington, 2 Bland 509 (1828).

54. Dinsmore v. Sachs, 133 Md. 434, 105 A. 524 (1919).

55. This language is also quoted in Orem v. Wrightson, 51 Md. 34, 43, 34 Am.Rep. 286, 288 (1878).

er, it reflects a purpose to honor his guaranty.

 We think Ammerman is entitled to the Melnick-Robinson notes by right of subrogation as a matter of law. Had the court recognized that right, then it could not have found an election by Ammerman to purchase the notes. "The rule that an appellate court will not disturb findings of fact made by the trial judge unless they are clearly erroneous does not apply if he has committed an error of law which has manifestly influenced or controlled his findings of fact * * *." Owen v. Commercial Union Fire Ins. Co. of New York, 211 F.2d 488, 489 (4th Cir. 1954).

## V

### DEFENSE OF USURY TO COUNTER-CLAIM

There is no question but that Miller's loans to the Melnicks and Robinsons were usurious under either the laws of Maryland or those of the District of Columbia.[56] Miller loaned them the sum of $125,000 but received promissory notes totaling $136,000 carrying interest at the rate of six percent per annum.[57]

Since we have determined that Ammerman's liability to Miller is not predicated upon an election to purchase the Melnick-Robinson notes but upon his guaranty, we must now consider the question of whether Ammerman, as a guarantor, may avail himself of the defense of usury.

The threshold legal question is whether the law of Maryland or the law of the District of Columbia applies.[58] It is Ammerman's position that since Miller counterclaimed on the Ammerman note of December 30, a note tainted by the usury of the Melnick-Robinson loan, and since the December 30 note was executed in the District of Columbia, the law of the District of Columbia applies.[59] Ammerman relies upon Holcombe v. O'Sullivan, 93 A.2d 96 (D.C.Mun.App. 1952) as dispositive of the question.

In *Holcombe,* the lender, a resident of Ireland, sued the borrower-maker of a promissory note for the balance allegedly due on the note. The defendant denied owing anything and counterclaimed for the alleged usurious interest paid. Plaintiff raised the question as to whether the District of Columbia law applied, suggesting that the loan may have been made when both parties were in Ireland, although there was no evidence of record that the defendant had ever been in Ireland. The court stated:

"The note is dated at Washington, D. C., and the place of payment is blank. In the absence of evidence to the contrary, the presumption is that the note was made in the District and was payable at the place of making and it therefore is subject to the District of Columbia usury law." 93 A.2d at 98.

We think Ammerman's reliance on *Holcombe* is misplaced. While the Ammerman note of December 30 was executed in the District of Columbia, it is not that note which is the nexus of the usurious loan. The usury originated in the loans from Miller to the Melnicks and Robinsons. These loans were negotiated in Maryland; they are evidenced by the Melnick-Robinson promissory notes dated Silver Spring, Maryland, January 24, 1966. These notes provided that the interest be paid to Miller at a designated Maryland address. The notes were secured by an assignment of the Melnick-Robinson interests in a

---

56. Ann.Code of Md.1957, Art. 49, §§ 1, 4 (1968 Replacement Volume) ; D.C.Code § 28–3303 (1967). These statutes set the annual legal rate at six percent and eight percent respectively.

57. Joint Appendix, Vol. 1, pp. 147a, 148a.

58. Under District of Columbia law, the lender in a usurious transaction forfeits all in-

terests, and can recover only the principal sum, less all monies paid. Under Maryland law, a usurious lender can recover the principal sum plus legal interest from date of the loan, less all monies paid..

59. Miller has presented no counter-argument on this issue and argues that under District of Columbia law a guarantor may not avail himself of the defense of usury.

joint venture, which owned the Dodge Park View Apartments, located in Prince George's County, Maryland. The assignment documents bear the seal and signature of a Maryland notary.

■ It is the majority rule that "[w]here all of the important elements of a loan transaction have their situs in the same state such transaction is governed by the usury laws of that state." 91 C.J.S. Usury § 4(4), and cases cited therein. It seems evident that all of the important elements of the loan transaction between Miller and the Melnicks and the Robinsons have their situs in Maryland. Hence, it is Maryland law which is applicable in regard to the usury involved in the Melnick-Robinson notes.

The Ammermans' December 30th note was given to extinguish Mr. Ammerman's liability as a guarantor of the Melnick-Robinson notes. Although the December 30th note was executed in the District of Columbia, this does not bring the case within the District of Columbia usury law.[60] Since Maryland law controls the usurious transaction involved in the Melnick-Robinson notes, the right of a guarantor to plead usury must also be determined by Maryland law.

■ At the time of the Melnick-Robinson loan from Miller, the Maryland legal rate of interest was six percent. Ann.Code of Md.1957, Art. 49, § 1 (1968 Replacement Volume). Miller concedes that the $11,000 difference between the amount of the loan and the face value of the notes was a "bonus." This was in addition to the interest on the notes at six percent. It is the law in Maryland that "[w]here a creditor exacts of a debtor, as a condition of the loan, a sum in addition to the lawful interest, whether designated as a bonus, commission, or carrying charge, or by any other name, the transaction is tainted with usury,

except where the sum so exacted, when added to the stipulated interest, does not exceed interest at the maximum lawful rate on the principal sum of the loan. Walter v. Foutz, 52 Md. 147; Bowdoin v. Hammond, 79 Md. 173, 28 A. 769; Glass v. Third National Building & Loan Ass'n of Baltimore City, 156 Md. 26, 143 A. 587." Plitt v. Kaufman, 188 Md. 606, 611–612, 53 A.2d 673, 675–676 (1947). The loan from Miller was usurious, and Melnick and Robinson could have defended on this ground in a suit for collection of their notes.

Although usury is considered a defense personal to the borrower, "sureties, guarantors, and accommodation indorsers may rely on the defense of usury whenever, in a similar case, the maker of an obligation could do so." 70 A.L.R. 359, and annotated cases following. See also Sureties and Guarantors, 91 C.J.S. Usury § 132, b, and cases there cited. Under the Uniform Commercial Code "'Surety' includes guarantors." Md. Laws of 1963, ch. 538, Ann.Code of Md. 1957, Art. 95B § 1–201(40) (1964 Replacement Volume).[61]

The Maryland Court of Appeals has ruled that the defense of usury is available to a third person who has assumed the obligation with the consent of all parties concerned and who is merely substituted for the original debtor. In Plitt v. Kaufman, *supra*, the third party was an accommodation maker. "There is no question that the accommodation maker of a promissory note has the right to set up against the lender the defense of usury between the lender and the borrower. Rodecker v. Littauer, 8 Cir., 59 F. 857." 188 Md. 613, 53 A.2d 676. *Cf.* Etelson v. Suburban Trust Company, 263 Md. 376, 283 A.2d 408 (1971) where the Maryland court stated that the liability of a guarantor of payment of a loan is indistinguishable from that of a co-maker.

---

60. See Rhawn v. Grant, 8 D.C. 31, 1 MacArthur 31 (1873), where the Court held that a note given in the District of Columbia in part payment of the principal of a note made in Pennsylvania is to be governed by the usury laws of Pennsylvania—not the usury laws of the District of Columbia.

61. This Act became effective February 1, 1964, Md.Laws of 1963, ch. 538, § 3.

 In the instant case, the execution of the *Consent Agreements* by Ammerman and Wolman was not a separate transaction from the loan from Miller to the Melnicks and Robinsons. The money would not have been loaned by Miller except for a guaranty by Ammerman and Wolman to pay Miller the face amount of the Melnick-Robinson notes. Hence, the *Consent Agreements* were instruments deemed necessary to consummate the one deal—the loan. There being usury in that loan, all the instruments employed to carry it out are tainted.

It is our conclusion that pursuant to Maryland law, the defense of usury is available to Ammerman as a guarantor, and has been established.

The Maryland statute regarding forfeiture in the event of usury provides:

"Any person guilty of usury shall forfeit all the excess above the real sum or value of the goods and chattels actually lent or advanced and the legal interest on such sum or value, which forfeiture shall ensure to the benefit of any defendant who shall plead usury and prove the same." Ann.Code of Md.1957, Art. 49, § 4 (1968 Replacement Volume).

Consequently, as to his counterclaim, Miller is entitled to recover the $125,000 loaned, plus six percent legal interest thereon, from January 24, 1966, to the date of judgment, less all monies heretofore paid relative to said loan by the Melnicks, Robinsons, Wolmans and Ammermans.[62] In addition, Miller is entitled to "costs of suit and ten per cent (10%) attorneys' fees" as provided in the note on which the counterclaim is based.

## CONCLUSION

The judgment of the District Court is affirmed insofar as it relates to the complaint. With respect to the counterclaim, we vacate the judgment and remand the case to the District Court for disposition in accordance with this opinion.

It is so ordered.

---

62. The parties should be allowed to produce additional evidence as to said payments if they so desire.