**Lester M. ENTIN, Joseph Waters and Michael J. Lembo, Plaintiffs-Appellants,**

**v.**

**CITY OF BRISTOL and The Bristol Redevelopment Agency, Defendants-Appellees.**

**No. 73, Docket 30570.**

United States Court of Appeals Second Circuit.

Argued Oct. 18, 1966.

Decided Nov. 15, 1966.

Joseph Adinolfi, Jr., Hartford, Conn. (Schatz & Schatz, Peter G. Kelly, and Davida S. Edelson, Hartford, Conn., on the brief), for plaintiffs-appellants.

William R. Murphy, New Haven, Conn. (Gumbart, Corbin, Tyler & Cooper, and Schuyler Jackson, New Haven, Conn., on the brief), for defendants-appellees.

Before WATERMAN, HAYS and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

In this action the plaintiffs are seeking the specific performance of a contract entered into by them with the Bristol Redevelopment Agency, acting as agent for the City of Bristol, Connecticut, for the sale by the plaintiffs and the purchase by the Redevelopment Agency of real property in Bristol. On the basis of certain admissions by the defendants in their pleadings and on the strength of three affidavits, the plaintiffs moved for summary judgment. This motion was denied by the trial court, first, on the ground that the authority of the assistant director of the Agency to make a particular statement in a letter which was a part of the writings evidencing

the contract, presented a genuine issue of material fact and, second, on the ground that there appeared to be a question, not briefed or argued by counsel, relating to the authority of the Agency, itself, to bind the City of Bristol because of the applicability of § 7–348 of the General Statutes, State of Connecticut, Revision of 1958, as amended.[1]

Shortly after the hearing on plaintiffs' motion, the defendants filed a motion for summary judgment and the parties were given an opportunity to file additional depositions, affidavits and other evidential material. The trial court granted the defendants' motion and dismissed the plaintiffs' action. It is from this judgment that the plaintiffs appeal. We reverse the judgment and remand the case for trial on the merits.

For the purpose of this appeal the plaintiffs, as non-mover appellants, are entitled to have the evidential material presented by them and the reasonable inferences to be drawn therefrom taken to be true. Jobson v. Henne, 355 F.2d 129 (2 Cir. 1966). So regarded the facts of the case appear to be substantially as follows:

The three appellants, known as Entin Associates, were, during the period with which this case is concerned, the owners of a tract of land, with factory buildings on it, in the City of Bristol. They had purchased the property from the Ingraham Company in 1960 and immediately leased the premises back to the grantor. Ingraham employed over a thousand people in Bristol and was a major taxpayer. By 1962 it became known that Entin Associates had constructed a new factory on their property in Farmington pursuant to an agreement with Ingraham to move its operations there and occupy and use the new factory under a long term lease. The loss of so substantial an employer and taxpayer caused considerable concern in Bristol and the then Mayor, Walter J. Murphy, Jr., other of-

ficials and civil groups developed a plan to keep Ingraham in Bristol. In essence the plan called for the acquisition by the Bristol Redevelopment Agency of the property of Entin Associates for an urban renewal project and the application for a loan for that purpose by the Bristol Redevelopment Agency, of which Mayor Murphy was chairman, to the Federal Housing and Home Finance Agency (HHFA). The plan also called for the construction of a new factory for Ingraham on another site in Bristol. Essential to the making of these arrangements was the release by the plaintiffs-appellants of Ingraham's obligations under the Farmington lease.

On March 9, 1962 the Agency filed its application for a loan for early land acquisition with the Regional Director of HHFA for the area, Charles J. Horan, who, after making a study of the project recommended to the Washington headquarters of HHFA that the sum of $2,367,670, including $2,232,836 for real estate acquisition be reserved for the purpose. On October 25, 1962 HHFA in Washington approved the recommendation and allocated the stated sum as capital grant funds for the project.

Meanwhile, in early 1963 the City negotiated with Entin Associates to release Ingraham from its commitment to lease the Farmington factory property. Entin Associates agreed to release Ingraham in consideration of the promise of the City to purchase the Entin Associates' Bristol property at its fair market value to be determined by qualified appraisers, provided the City accelerated the purchase of the property by early land acquisition procedures with the HHFA. To this the City agreed and Ingraham was released from its obligations relative to the Farmington property. The Agency, on behalf of the City had made two appraisals of the property of Entin Associates: one was by appraiser Adams on January 4, 1963 who reported that the fair market

---

1. The pertinent portion of § 7–348 reads as follows:

    "No officer of such town shall expend or enter into any contract by which the town shall become liable for any sum which, with any contract then in force, shall exceed the appropriation for the department * * *."

value of the property, including machinery, was $1,461,600; the other on January 25, 1963, was by appraiser Marsele, who stated that the value of the same property, also including the machinery, was $1,513,000.

On March 19, 1963 the City Council of Bristol voted to approve the early land acquisition for the purposes mentioned and agreed to assume certain contingent costs in connection therewith. On April 3, 1963 the Agency filed with HHFA a formal application for early land acquisition in which it sought a loan of $2,-258,000 of which $1,934,000 was estimated to be the cost of the purchases of real estate, including that of Entin Associates. Thereafter the HHFA reviewed all of the circumstances of the application and made field surveys. On May 24, 1963 the Urban Renewal Commissioner of HHFA gave Regional Director Horan written authority to proceed with early land acquisition and advised him that $2,190,530 had been allocated as a temporary loan and approved for expenditure. On May 31, 1963 Director Horan by letter advised the Agency of the authority to proceed and of the allocation of funds in accordance with the approved project expenditures budget to cover six months of early land acquisition activities. It empowered the Agency to incur costs in conformity with the budget in advance of the execution of a formal loan contract. He advised the Agency that the contract would require full data concerning property being acquired, submission of the second appraisal and HHFA's approval of maximum prices to be paid.

On June 17, 1963 the Agency recommended that HHFA approve $1,461,600, the lower of the two appraisals, as a fair maximum purchase price for the property of Entin Associates. Thereafter Brennan, Chief of HHFA's land acquisition staff, and Fantozzi, an HHFA land appraiser, examined the property in question for the purpose of determining whether or not the sum of $1,461,600 was a fair maximum acquisition price. They decided that it was and recommend-

ed it to the HHFA, which notified the Agency on July 18, 1963 that it was authorized to purchase the property of Entin Associates for that amount or less.

The Agency thereupon commenced final negotiations with Entin Associates and a purchase price of $1,315,000 was agreed upon. The appellants on July 22, 1963 made a written offer of the sale of the property to the Agency at the agreed price and on July 23, 1963 the Agency, by unanimous vote of its members, accepted the offer and, as specified in the offer itself, endorsed its acceptance thereon. On July 24, 1963 it also gave written notice of the acceptance through a letter to Entin Associates from the Agency's assistant director.

On June 27, 1963 a temporary loan contract, drafted by HHFA, had been sent to the Agency for signing. The Agency signed and returned it to HHFA for countersigning. At about the same time the parties were informed of Executive Order # 11114, issued by the President on June 25, 1963, requiring that such contracts include certain nondiscrimination provisions. The written contract was accordingly amended, and resubmitted to the Agency on August 30, 1963. As amended it was executed by the Agency and submitted to HHFA, which countersigned it on September 24, 1963, thus making available the funds necessary for the project. The trial court stated, and it does not appear to be questioned, that this loan contract is still in effect. On October 7, 1963 the Agency requested that it be sent the proceeds of the loan. Thereafter, however, no payment or tender of payment of the agreed sum was ever made by the Agency for the purchase of the Entin Associates' property, and the present action was brought to secure specific performance.

The trial court, in effect, held that it was compelled to grant the defendants' motion for summary judgment and to dismiss the plaintiffs' action because the Bristol Redevelopment Agency had no authority under the circumstances to purchase the plaintiffs' property. Its line of reasoning was that no official or

agency of a municipal corporation, such as the City of Bristol, could enter into a contract which would make the City liable for a sum in excess of the uncommitted balance of the appropriation for the department to which the official belonged or of which the agency was a part, because of the prohibiting provisions of § 7–348 of the Connecticut General Statutes. The trial court was of the opinion, however, that in the present case it would not be necessary that the City technically appropriate money to cover the purchase in question if the funds were made available through another source, i. e. the HHFA, which would take the place of such an appropriation and afford the safeguard to the taxpayers of the City which the statute was intended to provide. It then addressed itself to the question whether or not such funds had been made available to the Agency and decided that they had not been because it was undisputed that HHFA had refused to pay over the money. Therefore, there being neither an appropriation nor its equivalent from another source, the Agency was without authority to contract for the purchase of the property.

■ While we do not say that § 7–348 could not under any circumstances apply to a redevelopment agency or an officer of such agency, we are of the opinion that § 7–348 has no application to the present case. The Bristol urban renewal project was initiated and carried forward under Chapter 130 of the Connecticut General Statutes. It was unanimously approved by the Council, the legislative body of the City, acting on the basis of a cost estimate which had been submitted to it and with the understanding that the project was to be financed through a loan from HHFA. This approval, in effect, provided the safeguard against the act of a town or city official in committing the municipal corporation to expenditures beyond the unpledged balance of an appropriation. Once the project was approved by the City Council, the Agency, within the bounds of the project, had and could exercise the broad powers granted to it by § 8–143 of Chapter 130 of the Connecticut statutes.[2] In short, the procedures adopted and followed in the present case made § 7–348 unnecessary and inapplicable.

The appellees raise two technical points regarding the letter of July 24, 1963 from the assistant director of the Agency in response to the appellants' offer of July 22, 1963 to sell the property. They argue that there was no evidence of the communication of an unconditional acceptance of the offer because the assistant director in her letter, after reciting that the Agency had unanimously voted to accept appellants' offer to sell the specific property, added in a separate concluding paragraph, "As soon as this agency is in receipt of federal funds we shall proceed to purchase the property."

■ The written offer included a provision which said, "If this offer is accepted, The Bristol Redevelopment Agency shall endorse its acceptance hereon and mail notice thereof within 10 days to the seller at the address specified below." The written offer was duly endorsed "Acceptance p. 2 minutes 7–23–63." The assistant director wrote her letter on July 24, 1963, and mailed it to the offerors at the address specified. It is undisputed that both parties understood that the land purchase contract was conditioned upon the *availability* of funds from HHFA. The form of offer which the Agency drafted and required the appellants to use, placed a 60 day limit on the land purchase transaction and left it to the Agency to designate the time and place of the closing, within

2. The first sentence of § 8–143 reads as follows:
"A redevelopment agency shall have all the powers necessary or convenient to undertake and carry out urban renewal plans and urban renewal projects, including the authority to acquire and dispose of property, to issue bonds and other obligations, to borrow and accept grants from the federal government or other source and to exercise the other powers which this chapter confers on a redevelopment agency with respect to redevelopment projects."

that limit, in the following words: "The Bristol Redevelopment Agency shall specify the place and time of closing, which shall not be more than 60 days after the date of acceptance." On July 24th the parties had reason to expect that the loan would be processed and that the funds would be available within the 60 days. The Agency, however, could not on July 24th know on precisely what date within that time the money would be in hand. A trier could reasonably infer that the assistant director's closing sentence, "As soon as this agency is in receipt of federal funds we shall proceed to purchase the property" was nothing more or less than a gratuitous comment about the designation of the time and place of the closing, which under the terms of the written offer was to be within the 60 days, but which was otherwise left to the sole prerogative of the Agency, which was not required to make it a part of its acceptance or, for that matter to make it in writing. As the Agency, in the offer form which it had drafted, arrogated unto itself the power to fix, within the 60 days, the precise time and place of the closing, it is hardly in a position to complain that the contract was thereby invalidated. This did not constitute a counteroffer as appellees urge but under the circumstances, was entirely consistent with the terms of the offer. We are of the opinion that the Agency's letter of July 24, 1963 could be held to communicate an unconditional acceptance of the appellants' offer of July 22, 1963 and the terms are sufficiently specific to satisfy the Statute of Frauds.

■ The second point urged by the appellees is that because the loan transaction actually took two days more than 60 days after the acceptance before HHFA funds became available on September 24, 1963, the plaintiffs-appellants lost their contractual rights. There is, however, sufficient evidence to support a finding that the parties by mutual consent extended the closing date and kept the contract in effect. Cf. Fischer v. Kennedy, 106 Conn. 484, 138 A. 503 (1927).

■ On the basis of the evidential material, regarded from the viewpoint of the non-mover for summary judgment, we conclude that two valid contracts were made between Entin Associates and the City: one by Entin's release of Ingraham in return for the City's promise to buy the property with the proceeds of an HHFA loan, and the other by the formal, written offer and acceptance of July 22–24, 1963; and that the oral Ingraham release contract established a condition precedent to the written land purchase contract, namely that the operativeness of the land purchase contract was conditioned upon the availability of necessary funds through a loan from HHFA. Lach v. Cahill, 138 Conn. 418, 421, 85 A.2d 481 (1951); Choolgian v. Nordstrom, 111 Conn. 572, 150 A. 499 (1930); Cimarron Insurance Co. v. Pomeroy, 234 F.2d 262 (10 Cir. 1956); Corbin, Contracts § 589 (1963); Restatement, Contracts § 241 (1932). We conclude further that this condition was fulfilled on September 24, 1963 when the funds became available through the temporary loan contract; that Entin Associates performed all their duties and obligations under both contracts, including a tender of a deed of the property; and that the agreed purchase price has never been paid by the appellees to the appellants.

If this were the end of the story, there would be no doubt that the appellees had wrongfully repudiated a contract to purchase real property, and a decree for specific performance in favor of the appellants would have been in order. The City and the Agency, however, assert a justification for not completing the contract of purchase. It is their claim that the HHFA did not pay over to them the proceeds of the loan and that the land purchase contract therefore never became operative. The facts relating to the failure of the HHFA to honor the requisition are lost in the plethora of charges and countercharges and the sharply conflicting statements emerging from the evidential material. Approached from the standpoint of the ap-

pellees it could reasonably be found that the withholding of the funds was attributable to the fact that the City government had by an election been placed in the hands of an administration hostile to the urban renewal project.

Of course, at a trial of the issues in this case, the burden of proof must rest upon the plaintiffs-appellants to show that a lawful contract was entered into between the defendants-appellees and themselves, that all of the duties and obligations of the plaintiffs-appellants were duly performed, that any condition precedent to which the contract itself was subject was fulfilled, and that the defendants-appellees had failed to discharge their duties under the contract. But the burden of proving justification for the defendants-appellees in not completing their obligations under the contract rests upon the defendants-appellees themselves. Archambeault v. Jamelle, 100 Conn. 690, 698, 124 A. 820 (1924); State ex rel. Capurso v. Flis, 144 Conn. 473, 477, 133 A.2d 901 (1957); Taylor v. Hamden Hall School Inc., 149 Conn. 545, 551, 182 A.2d 615 (1962); Mercer Electric Mfg. Co. v. Connecticut Electric Mfg. Co., 87 Conn. 691, 697, 89 A. 909 (1914); Banta v. Stamford Motor Co., 89 Conn. 51, 92 A. 665 (1914). See James Civil Procedure § 7.8 (1965).

The appellees argue, as the court below held, that it is sufficient and conclusive for them to prove that they did not receive from HHFA the proceeds of the loan contract. At the time of the making of the land-purchase contract the parties were aware that the contract was conditioned upon the procurement by the Agency of a loan from HHFA from the proceeds of which the purchase price of the property was to be paid and it was the task and the responsibility of the defendants-appellees, under this contract as well as under the Ingraham release contract, to put forth every reasonable endeavor to obtain the loan and acquire the proceeds. The duty to pay the plaintiffs-appellants the purchase price presupposed a duty on the part of the de-

fendants-appellees to make, in good faith, a diligent effort to secure the funds. Lach v. Cahill, 138 Conn. 418, 422, 85 A. 2d 481 (1951); Webb v. Moeller, 87 Conn. 138, 141, 87 A. 277 (1913); Vanadium Corp. v. Fidelity & Deposit Co., 159 F.2d 105, 108 (2 Cir. 1947); Atlas Trading Corp. v. S. H. Grossman Inc., 169 F.2d 240 (3 Cir. 1948). Such a duty would obviously be violated by anything done by the City to encourage or induce the failure or revocation of the condition precedent. Vanadium Corp. v. Fidelity & Deposit Co., supra; Omaha Public Power District v. Employers' Fire Insurance Co., 327 F.2d 912, 916 (8 Cir. 1964); Corbin, Contracts § 770 (1963); Restatement, Contracts § 295 (1932); 17A C.J.S., Contracts § 468b. Where, as here, the funds had become available and the borrower had a right to the proceeds, the duty extends to the use of court proceedings if necessary. Moreover, pursuant to the terms of the related contract, the appellants had released Ingraham in return for, and in reliance upon, the City's promise speedily to process early land acquisition procedures which plainly included the borrowing of funds for the purpose from HHFA.

Appellees take the position that they are conclusively bound by the fact that, after the HHFA had made the funds available, Regional Director Horan decided not to pay over the loan proceeds even though this might be the result of sheer whimsey on his part or as the trial court put it "merely * * * the ipse dixit of the HHFA." They, in effect, also take the position that to require them through the present action by the appellants to proceed against the HHFA would indirectly violate a provision in the loan contract which denies to third persons, such as the appellants here, the right to proceed against the HHFA, as third party beneficiaries. These claims have no merit and cannot serve to relieve the appellees of their duties and obligations under the land purchase contract; nor is there anything to prevent the defendants-appellees from moving to bring in the HHFA in third party defendant

proceedings under F.R.Civ.P. 14(a), if necessary.

If the position of the appellees were correct, then a contract by a property owner with a city redevelopment agency in a federally financed redevelopment or urban renewal project would be an unreliable agreement, because the agency would have the power to repudiate it by a very simple expedient. The relationship between redevelopment agencies and the federal agencies empowered to finance their projects may be very close, with an identity of political interests and motives which could readily provide a fertile ground for collusive action. If, on a word from the municipality's redevelopment agency, the federal agency could or would withhold for an insubstantial reason or no reason at all, funds contracted to be paid, then under appellees' theory, the redevelopment agency would *ipso facto* be relieved, by virtue of § 7–348 of the Connecticut statutes, of its obligations under the purchase agreement with the property owner and the latter, having no third party beneficiary rights, would be barred from proceeding against the federal agency. The property owner, with his contract repudiated and all remedies denied him, would be far better off to place himself at the mercy of condemnation proceedings. Such a result would not be in the public interest, and it is certain that neither Congress nor the Connecticut legislature intended that their statutes be interpreted, as the appellees claim, to immunize a municipality from the burden of its contractual obligations under circumstances such as those presented here.

If the plaintiffs-appellants are able to sustain their burden of proof, and the defendants-appellees are unable to persuade the trier that it was justified in not paying the purchase price, then a decree should be entered in favor of the plaintiffs-appellants. If the Agency's failure to pay the land purchase price after the funds became available was not justified at the time, then the fact that the Agency's rights under the temporary loan contract may have subsequently expired, will not deprive the plaintiffs-appellants of the right to specific performance of the contract. In effect the land purchase contract is relieved of the condition precedent which is excused.

In the case of City of Del Rio v. Ulen Contracting Corporation, 94 F.2d 701 (5 Cir. 1938), the City contracted with the plaintiff to make certain extensions of the City's system of waterworks on the understanding that the plaintiff would be paid out of funds obtained by the city from specified federal sources. There was a delay in the receipt of the federal funds and the city, believing the situation urgent, abandoned the federal program and performed the work itself. Though not a land purchase contract case, a similar principle as to liability was imposed in awarding damages for lost profit. The plaintiff recovered a judgment in the trial court, and the appellate court affirmed, saying in part, at 705:

"Appellant points out that its contract with appellee recites that funds to finance the work were to be procured from PWA; that these funds have never been received; and that the contract provides that the city will make payments to the contractor 'only as the money is made available' by PWA. It appears, however, that the city voluntarily abandoned its financing contract with PWA because it was dissatisfied with the delay, and immediately proceeded with the construction project through a purported contract with another contractor, paying for the work with funds secured from another source. The city cannot thus escape liability to appellee."

See also De Leuw Cather & Co. v. City of Joliet, 327 Ill.App. 453, 64 N.E.2d 779 (1945).

If the evidence at the trial after remand shows that, after the proceeds of the loan contract became available on September 24, 1963, the City or its officials without justification caused, induced or encouraged the HHFA to withhold the money and refuse payment

of it to the Agency, equitable estoppel would operate to bar the defendants-appellees from making the claim that they were relieved of their obligations under the land purchase contract because HHFA had refused to pay. The doctrine of equitable estoppel applies to municipal corporations as it does to individuals, McQuillan Municipal Corporations § 29.-103, where, as in this case, there was full authority for the making of the agreement that contained the promise to pay. On the other hand, if it appears that the proceeds of the loan contract were withheld because of fraud or misrepresentation on the part of the appellants or for other unlawful or inequitable action on their part, or if it is shown that, after the proceeds of the loan contract had been made available, the payment of the money was withheld for reasons wholly apart from any effort on the part of the defendants-appellees to hinder or prevent such payments and for reasons entirely beyond their control, such as the claimed discovery after the funds had been made available that the loan had been based upon clearly unreasonably high appraisals, then the plaintiffs-appellants should be denied the equitable relief they seek. See Fischer v. Kennedy, supra; Nikora v. Mayer, 257 F.2d 246 (2 Cir. 1958).

It has been apparent both from portions of the evidential material in the record and from the arguments of counsel that the legal relationships of the parties may have been affected by changes in the City's administration and the private and political interests and rivalries of particular individuals and office holders. Neither the propriety or impropriety of the purposes or motives of anyone identified with the land purchase contract nor the feasibility or desirability of the project from the standpoint of the City's best interests nor the suitability of the terms of the contract, including the amount to be paid for the property, is before this court, and the decision of the court in no way passes upon them. We are solely concerned with the question of whether or not the case presents genuine issues of material fact which in the light of the applicable law require that the action be tried out on its merits. We are of the opinion that it does, and therefore, the judgment below is reversed and the case is remanded.