663 F.2d 168
 213 U.S.App.D.C. 404
 R. A. WEAVER AND ASSOCIATES, INC., et al.
v.
HAAS AND HAYNIE CORPORATION
and
Blake Construction Company, Inc., Appellants.
R. A. WEAVER AND ASSOCIATES, INC., et al., Appellants,
v.
HAAS AND HAYNIE CORPORATION
and
Blake Construction Company, Inc., et al.
 Nos. 78-1205, 78-1283.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 25, 1979.
Decided Dec. 4, 1980.
 
 Robert F. Condon, Washington, D. C., for appellants in No. 78-1205 and cross-appellees in No. 78-1283.
 Morris Rosenberg, Baltimore, Md., also entered an appearance for International Stone and Erectors, Incorporated, appellee in No. 78-1205 and cross-appellant in No. 78-1283.
 Jerry S. Cohen, Washington, D. C., with whom Michael D. Hausfeld, Washington, D. C., was on the brief, for appellees in No. 78-1205 and cross-appellants in No. 78-1283.
 Before WRIGHT, Chief Judge, ROBINSON, Circuit Judge, and LARSON*, United States Senior District Judge for the District of Minnesota.
 Opinion PER CURIAM.
 
 PER CURIAM:
 
 1
 At issue are judgments in favor of two plaintiffs, R. A. Weaver & Associates, Inc. (Weaver) and International Stone & Erectors, Inc. (ISE), against two defendants, Blake Construction Company, Inc. (Blake) and Haas & Haynie Corporation,[1] for damages for breach of contract and tortious conversion of property.[2] The District Court predicated the judgments on jury verdicts which, save in one respect, the court refused to set aside. We sustain the award for the conversion found. We reverse, however, the judgments for breach of contract and remand that aspect of the litigation for further proceeding.
 
 I. BACKGROUND
 
 2
 In 1971, the General Services Administration (GSA) invited bids for the construction of a federal office building in the District of Columbia designated as the "South Portal" site project.[3] The architectural plans for the project specified black slate from Maine or Virginia as the material to be used in paving the plaza and driveways.[4] Blake submitted a lump-sum bid incorporating the price quoted to it for a Virginia black slate meeting the specifications.[5]
 
 
 3
 GSA awarded the construction contract to Blake in 1972, whereupon Blake commenced negotiations with suppliers for the purchase of the slate required for the plaza and driveways.[6] Weaver and ISE were among those interested in supplying slate for the project. Weaver quoted to ISE a price for Nor Cashire slate-a blue-black slate to be quarried in England and fabricated in the United States[7]-and ISE in turn proposed its use to Blake.[8] As a result, on March 19, 1972, Blake and ISE entered into a purchase-order contract,[9] the terms of which are vital in this litigation. The contract evidenced ISE's agreement to furnish, for a stated price, Nor Cashire slate and domestic granite[10] "in full and complete accord with the Specifications and Drawings prepared by the Architect and forming a part of the Contract, for subject project, between the Contractor and the Owner."[11] More finely, the parties stipulated that "(t)his contract ... is subject to the approval by the Owner of imported but domestically fabricated 'Nor Cashire' Blue Black Slate meeting the requirements of the 'Buy America (American) Act;' "[12] still later, they reiterated that "(t)he items to be provided herein are subject to approval by the Owner."[13] The contract was silent, however, on the time within which approval was to be secured. To boot, a nearly contemporaneous letter from ISE to Blake amending the purchase order stated:
 
 
 4
 The contract is based upon the approval of Nor Cashire Slate by the Owner. (We are) to prepare the necessary documents showing how (we) propose( ) to meet the requirements of the "BUY AMERICA (American) ACT." This also (may be) subject to the Owner's approval if requested. Should we not secure approval of the above, it is understood that the contract will be void without recourse to either party. We stand ready to assist to secure approval.[14]
 
 
 5
 A bit later, ISE contracted with Weaver for the purchase of Nor Cashire on terms similar to those in the Blake-ISE agreement.[15]
 
 
 6
 In June, 1973, in accordance with the specifications governing construction, test data, certifications and samples of Nor Cashire slate were furnished to supervising architects for approval. On July 17, 1973, however, the architects disapproved the proposed slate for three reasons.[16] The modulus of elasticity, they stated, was substantially lower than the value required;[17] the appearance of the slate, they added, was unsatisfactory;[18] furthermore, they pointed out, the slate was a foreign rather than a domestic product.[19]
 
 
 7
 Promptly, on July 20, Blake objected, and on August 19, transmitted a Weaver-prepared letter with attachments protesting the architects' decision.[20] About November 1, Blake augmented these submissions with a formal petition for approval of the slate under the Buy American Act.[21] Meanwhile, the architects modified their July 17 position. In a letter to GSA's contracting officer dated September 11, 1973, they expressed the opinion that the Nor Cashire slate "substantially meets the requirements of" the specifications;[22] "(p)rovided that the test data submitted applies to the Grade 'A' and to the Select Stock, both samples would have the physical properties required for paving stones."[23]
 
 
 8
 Walter E. Huber, however, the GSA contracting officer who alone had authority to substitute Nor Cashire slate for the slate originally designated,[24] did not act immediately to approve the slate. Though perhaps prepared to authorize the change if need be,[25] he desired instead to investigate with Blake the possibility of substituting granite for slate with an equitable adjustment making the substitution economically feasible for GSA.[26] For this reason, three months went by without any decision by the contracting officer as to whether Nor Cashire slate would be accepted. On December 14, 1973, after unfruitful discussion of the matter with ISE, Blake gave formal notice that it was cancelling its contract with ISE for nonsatisfaction of the contractual requirement of GSA approval of the Nor Cashire slate.[27] Some months later, after negotiations with Blake, GSA substituted charcoal black granite for slate as the paving material for the plaza and driveways.[28]
 
 
 9
 One more episode completes the factual background. Weaver had prepared a 13-page set of shop drawings showing the size and placement of slate and granite to be used in the South Portal site project.[29] Weaver had submitted these drawings to ISE, and ISE had delivered them to Blake. After cancellation of the Blake-ISE contract, Blake turned the drawings over to Cold Spring Granite Company (Cold Spring), the supplier of the granite ultimately employed in the project, a step by which Blake benefited to the tune of a $13,000 credit on Cold Spring's contract price to Blake.[30] Later, Blake offered ISE and Weaver $10,000 for the drawings, but only on condition that they execute a full release of all claims against Blake arising out of the contract cancellation.[31] Not surprisingly, ISE and Blake declined this proposition.[32]
 
 
 10
 In 1975, ISE, Weaver and another[33] instituted an action in the District Court against Blake and others,[34] and the case reached trial before a jury. Claims of breach of contract and tortious conversion of the shop drawings survived a defense motion for a directed verdict,[35] the court reserving decision on the motion.[36] The jury returned verdicts favoring the plaintiffs on each of these claims, finding, in the court's words, "that plaintiffs had proved by a preponderance of the evidence that: (1) (Blake) had breached (the) contract with (ISE); (2) (Weaver) was a third-party beneficiary of the contract between (Blake) and ... ISE; and (3) (Blake) tortiously converted the shop drawings of ... ISE and Weaver."[37] For the contract breach, the jury awarded ISE $30,000 and Weaver $86,000 as compensatory damages; for conversion of the shop drawings, the award to them was $17,000 as compensatory and $100,000 as punitive damages.[38]
 
 
 11
 Blake thereafter moved for judgment notwithstanding the verdict.[39] The District Court granted the motion with respect to profits assertedly lost by the claimants, thus limiting them to out-of-pocket expenses of $2,000 and $12,000, respectively, but denied the motion in all other respects.[40] These appeals followed.[41]
 
 II. TORTIOUS CONVERSION
 
 12
 We first consider Blake's multifaceted assault on the verdict finding a conversion of the shop drawings furnished Blake, and assessing compensatory and punitive damages therefor. Careful examination of Blake's objections in light of the trial record satisfies us that the District Court was eminently correct in its refusal to upset the jury's decision on this segment of the litigation.
 
 
 13
 Blake argues initially that the evidence did not support findings establishing the elements of a tortious conversion, as distinguished from a breach of contract. More specifically, Blake asserts that ISE and Weaver were legally entitled, not to return of the drawings, but only to be paid for them. On that promise, and since punitive damages are not ordinarily recoverable for breach of contract,[42] Blake insists that an allowance of punitive damages was in error. The fallacy in Blake's position is that it overlooks the claimants' proprietary interest in the drawings[43]-an interest quite apart from their contractual right to payment, and one that they retained throughout. Fairly appraised, the evidence shows that Weaver prepared and submitted the drawings as part of the joint endeavor with ISE to sell their slate and granite products for use in the South Portal site project. We perceive nothing in the evidence that would demonstrate that ISE and Weaver ever surrendered their ownership of the drawings to Blake. Moreover, as the District Court stated,
 
 
 14
 ample evidence was adduced at trial to prove that defendants unlawfully exercised ownership, dominion, and control over plaintiffs' shop drawings in denial and repudiation of plaintiffs' rights thereto. Mr. Morton Bender, President of defendant Blake Construction Co., admitted in his testimony that the shop drawings were plaintiffs' property and that he knew he had an obligation to pay plaintiffs therefor. Mr. Bender also admitted (1) that defendant Blake transferred plaintiffs' shop drawings to Cold Spring in exchange for a $13,000 decrease in the contract price for the provision of granite, and (2) that the Government added $13,000 as an equitable adjustment to the contract price to be paid to Cold Spring on the ground that Cold Spring had paid $13,000 to Blake, who in turn was to pay that sum to plaintiffs ISE and Weaver. Mr. Bender further admitted on the stand that he never tendered the money nor even made an unconditional offer to tender the $13,000 to the plaintiffs until the actual trial. Mr. Bender only offered before trial, according to his story, to pay plaintiffs for the drawings only if they settled all other outstanding claims against Blake and even then he only offered to pay plaintiff the sum of $10,000. The jury's determination that defendants were liable in conversion for the reasonable value of the shop drawings was thus supported by substantial evidence and was entirely reasonable.[44]
 
 
 15
 We are also satisfied that the jury did not go astray in its assessment of damages for the conversion. As evidence buttressing the award of $17,000 compensatory damages, the District Court pointed out that "(i)n view of the fact that defendants were able to sell these shop drawings for $13,000 to Cold Spring, it was perfectly reasonable for the jury to infer that plaintiffs could have obtained $4,000 more for the drawings had they been afforded their rightful opportunity to negotiate the sale themselves."[45] Furthermore, as the District Court added, "the jury was entitled to give appropriate weight to plaintiff Weaver's testimony that the drawings were worth $30,000."[46] Since the measure of compensatory damages was the value of the drawings,[47] we deem the verdict adequately justified in amount.
 
 
 16
 We think, too, that in the circumstances portrayed by the evidence, the jury was properly permitted to consider an imposition of punitive damages. As the District Court observed,
 
 
 17
 Mr. Bender at all times knew that the shop drawings were plaintiffs' property. Nevertheless, he intentionally and deliberately withheld the $13,000 payment he had received therefor, and offered to pay only part of this sum to plaintiffs and only then if they agreed to compromise all their other outstanding claims, including their breach of contract claims. Only at trial did Mr. Bender acknowledge plaintiffs' lawful right to the shop drawings. There can be no doubt that the jury's inference of the requisite malicious, wanton and/or willful disregard of plaintiffs' rights from this course of behavior was entirely appropriate.[48]
 
 And we agree with the District Court that
 
 18
 the jury's award of $100,000 as punitive damages is not, in the circumstances of the present case, "so great as to shock the conscience" nor is it "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." Williams v. Steuart Motor Company, 494 F.2d 1074, 1085 (D.C.Cir.1974), quoting Frank v. Atlantic Greyhound Corp., 172 F.Supp. 190, 191 (D.D.C.1959), and Graling v. Reilly, 214 F.Supp. 234, 235 (D.D.C.1963). See Wingfield v. Peoples Drug Store, Inc., 105 Wash.Daily L.Rep. 2081, 2086 (D.C.App.1977) (November 17, 1977). Nor can it be said that the award of $100,000 is "excessive, or larger than should be condoned in simple justice," Afro-American Publishing Co. v. Jaffe, 366 F.2d 649, 663 (D.C.Cir.1966), in view of the magnitude of defendants' business enterprise.[49]
 
 III. BREACH OF CONTRACT
 
 19
 We move on to the contentions, two in number, that Blake advances in its attempt to overturn the verdict finding a breach of the Blake-ISE purchase-order contract. One-that Weaver could not properly have been regarded as a third-party beneficiary of that agreement-gives us little pause. Before the contract came into being, Blake knew that early on Weaver had sought architectural approval of Nor Cashire slate for the South Portal site project; that in 1972 Weaver had himself submitted a bid to supply that slate; that Weaver was the exclusive distributor for Nor Cashire slate in the United States; that ISE represented Weaver in quoting the bid to Blake on Nor Cashire slate; and that Weaver was to supply the slate for ISE in fulfillment of the contract. Additionally, events subsequent to execution of the contract reflected a preexistent common understanding of Weaver's vital interest therein. Weaver provided the samples of Nor Cashire slate, submitted all test data on that slate, and assembled the documentation for the effort to obtain its acceptance under the Buy American Act. Indeed, Blake's petition to GSA for that approval expressly acknowledged that it was presented on behalf of Weaver as well as ISE.[50] The status of one unnamed in a contract as a third-party beneficiary is essentially a matter of intention,[51] and the verdict fared well enough under that standard.
 
 
 20
 Blake's remaining argument, however, does identify a vulnerable spot in the verdict on breach of contract. The claim is that the evidence could not possibly have sustained the jury's conclusion that the contract was breached because, Blake says, the contractual stipulation requiring GSA approval of Nor Cashire slate was not satisfied. We agree that Nor Cashire slate was never accepted as material suitable for use in the South Portal site project[52] and that consequently the condition precedent to performance of Blake's express obligations under the contract was never met.[53] As the District Court delineated:
 
 
 21
 The uncontradicted and unimpeached testimony of Walter E. Huber, who as the GSA Contracting Officer for the South Portal site was the final authority on contract matters concerned therewith, was that he had made a decision during the fall of 1973 to change the paving material at the South Portal site from slate to granite. Mr. Huber testified that the reasons for making this decision were: (1) after seeing an installed sample of Nor Cashire slate, he had concluded that the slate was an "undesirable finish" because its rough testure (sic ) (elsewhere described as "lippage") gave rise to potential safety problems, such as tripping and (2) the architects had expressed a definite preference for granite over slate because of aesthetic considerations. Mr. Huber testified further that the Government was in no way obligated to accept plaintiffs' Nor Cashire slate if it determined, as it did on March 4, 1974, that granite or some other paving material were preferable.[54]
 
 
 22
 The inquiry cannot end at this point, however, for two further questions persist. One is whether Blake acted prematurely in cancelling the contract on the ground of non-satisfaction of the condition, for if it did it violated an implied term of the contract.[55] The other question is whether Blake failed in performance of any duty of good-faith cooperation with ISE and Weaver which, though not articulated in the contract, may nevertheless have been still another implied stipulation thereof.[56] To these two matters we now turn.
 
 
 23
 While the Blake-ISE contract explicitly conditioned Blake's performance on GSA's acceptance of Nor Cashire slate in lieu of the slate originally specified, the contract was silent on the period within which acceptance might permissibly be obtained. A reasonable time for securing GSA approval thus became an implied term of the agreement.[57] We are mindful that almost nine months elapsed between formation of the contract and its cancellation by Blake without a definitive decision by GSA on substitution of Nor Cashire slate. But we cannot say that timewise the cancellation was so clearly reasonable that fair-minded people could not disagree. The question, then, was one for the jury,[58] and the distressing fact is that the District Court's instructions to the jurors did not leave them room to ponder a verdict on the question whether Blake breached the contract by terminating it prematurely.[59]
 
 
 24
 The verdict on breach of contract thus is unacceptable either as a presumed finding that the event conditioning Blake's performance had occurred or as a finding that Blake unreasonably shortened the period for its possible occurrence. One other theory deserves exploration, however.
 
 
 25
 It is well settled that nonoccurrence of a condition precedent to a promissor's performance is normally excused when fairly attributable to the promissor's own conduct.[60] An express promise to perform on the happening of an event warrants implication of a promise to refrain from activity impeding its happening,[61] and breach of the implied promise is legally as serious as breach of the express.[62] This rule is properly invoked not only when the promissor completely forecloses occurrence of the condition[63] but also when he substantially hinders its occurrence.[64] Some courts extend the injunction to the point of holding that parties to a contract impliedly covenant, not only to refrain from active interference, but affirmatively to cooperate in good faith efforts to achieve whatever is necessary to clear the way for performance.[65] There are exceptions as valid as the principles themselves, but they come to no more than adequate justification for whatever the promissor did.[66]
 
 
 26
 Even assuming that the District Court was free to resort to this body of doctrine,[67] it gave instructions authorizing consideration of Blake's precancellation conduct only in terms of an obligation to refrain from prevention or hindrance of GSA approval of Nor Cashire slate.[68] The evidence certainly did not support any theory that Blake actively interfered with approval, but by our appraisal, it was not so one-sided that it foreclosed the possibility of a finding that Blake fell legally short on a duty to cooperate.[69] So, when the time arrived for the court to instruct the jury, it became important to ascertain whether under the applicable law cooperation was an implied term of the contract; and the first step ordinarily would have been a determination on the local-law principle to be applied.[70] The record, however, reflects no consideration of the choice-of-law problem, and offers no clear-cut indication of the court's view on whether a duty to cooperate was to be recognized as part of the body of substantive jurisprudence to be administered. All we really know is that the charge to the jury limited Blake's implied obligation to a duty not to prevent or hinder performance.[71] It follows that the verdict cannot be salvaged on the theory that it could have rested on a finding that Blake shortchanged ISE and Weaver on cooperation.
 
 
 27
 The judgment of the District Court is affirmed insofar as it established and awards damages for conversion of the shop drawings. In its relation to the breach-of-contract claims, the judgment is reversed and the case is remanded to the District Court for further proceedings consistent with this opinion.[72]
 
 
 28
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d) (1976)
 
 
 [1]
 Haas & Haynie Corporation (H&H) was a joint venturer with Blake as general contractor for the construction work from which this litigation stemmed. H&H had nothing to do with the actual decisionmaking or day-to-day management of the project; instead, Blake was the managing venturer for the project. Joint Appendix (J.App.) 115. We refer herein to Blake and H&H merely as Blake
 
 
 [2]
 There were other parties to the litigation. See notes 33, 34 infra
 
 
 [3]
 J.App. 217
 
 
 [4]
 J.App. 246
 
 
 [5]
 J.App. 260. It is standard practice in the construction industry for a general contractor bidding on a job to seek quotations from subcontractors for work and materials, and then to utilize the quotations in formulating a bid figure. These initial price quotations do not necessarily eventuate as the general contractor's actual costs. After the contract is awarded, the bidder becoming the general contractor may bargain with subcontractors other than those who furnished quotations and thereby secured the necessary work and materials. Brief for Appellees and Cross-Appellants at 6-7 (unnumbered footnote)
 
 
 [6]
 J.App. 288
 
 
 [7]
 As early as 1971, Weaver had explored the possibility of supplying Nor Cashire slate for the South Portal site project. Efforts in that direction led to a letter from a group of supervising architects to GSA advising that Nor Cashire slate "apparently is capable of meeting all of the structural requirements for the proposed exterior uses," and that "(i)n any case, we find this slate is completely acceptable to us, as architects, from the appearance point of view, and its use may be permitted at both the interior and exterior parts of the building." J.App. 308
 
 
 [8]
 The proposal was first made on March 11, 1972, prior to GSA's selection of Blake as general contractor. ISE then told Blake that Weaver was the American distributor for Nor Cashire slate and that GSA had approved its use in the South Portal site project. J.App. 304. The proposal was renewed on February 12, 1973, at which time ISE informed Blake additionally that it represented Weaver and that Nor Cashire slate would pass muster under the Buy American Act, 41 U.S.C. §§ 10a-10d (1976)-legislation concerning the use of imported materials on domestic governmental construction projects. J.App. 306
 
 
 [9]
 J.App. 315
 
 
 [10]
 The granite was to be devoted to uses other than plaza and driveway paving, and plays no part in these appeals
 
 
 [11]
 J.App. 315. "Owner" obviously referred to the United States Government
 
 
 [12]
 J.App. 315. The general nature of the legislation referred to is indicated in note 8 supra
 
 
 [13]
 J.App. 316
 
 
 [14]
 J.App. 127
 
 
 [15]
 J.App. 126
 
 
 [16]
 J.App. 268
 
 
 [17]
 J.App. 268
 
 
 [18]
 J.App. 268
 
 
 [19]
 J.App. 268
 
 
 [20]
 J.App. 280
 
 
 [21]
 J.App. 334
 
 
 [22]
 J.App. 321
 
 
 [23]
 J.App. 322
 
 
 [24]
 This the parties fully concede. Brief for Appellants and Cross-Appellees at 10; Brief of Appellees and Cross-Appellants at 16
 
 
 [25]
 At trial, Huber stated that in his judgment Nor Cashire slate was acceptable as the material required for plaza and driveway paving at the South Portal site project with regard to both physical and aesthetic properties. Trial Transcript (Tr.) 292. He further stated that he was bound to accept Nor Cashire slate as an approved material so long as it satisfied the Buy American Act. Tr. 289-291. At the time, however, the architects were interested in ascertaining the availability of granite instead of slate, and this they told Huber, who testified that he wished to inquire of Blake as to the possibility of substituting granite for slate if an equitable adjustment could be secured to make the substitution economically feasible for GSA. Tr. 327
 
 
 [26]
 Tr. 327. Further details appear in text infra at note 54
 
 
 [27]
 J.App. 388
 
 
 [28]
 J.App. 376
 
 
 [29]
 J.App. 394
 
 
 [30]
 J.App. 393
 
 
 [31]
 Tr. 560-561
 
 
 [32]
 For the District Court's description of these events, see text infra at note 44
 
 
 [33]
 The third plaintiff, Barretto Granite Company (Barretto), was expected to become the supplier of granite to Blake if it chose to honor a request by ISE, after the Nor Cashire slate proposed had long been under submission to GSA, that Blake submit a bid for ISE to supply granite in lieu of slate to GSA. Barretto, like Weaver, sued on the theory that it was a third-party beneficiary of the Blake-ISE contract. The District Court granted Blake's motion for a directed verdict against Barretto, and that ruling has not been appealed
 
 
 [34]
 The other defendants were H&H, see note 1 supra, and Cold Spring
 
 
 [35]
 The District Court had previously dismissed counts alleging fraudulent representation and tortious interference with the Blake-ISE contract when the claimants made known their desire to abandon them, and had entered a summary judgment against them on a count charging an antitrust conspiracy. R. A. Weaver & Assocs., Inc. v. Haas & Haynie Corp., Civ. No. 75-2142 (D.D.C. Dec. 23, 1977) at 1 n.1; J.App. 203
 
 
 [36]
 See Fed.R.Civ.P. 50(b)
 
 
 [37]
 R. A. Weaver & Assocs., Inc. v. Haas & Haynie Corp., supra note 35, at 2, J.App. 204
 
 
 [38]
 Id
 
 
 [39]
 See Fed.R.Civ.P. 50(b)
 
 
 [40]
 R. A. Weaver & Assocs., Inc. v. Haas & Haynie Corp., supra note 35, at 3, J.App. 205
 
 
 [41]
 Blake appeals from each of the three judgments entered by the District Court. ISE and Weaver appeal from the court's action in setting aside the breach-of-contract verdict to the extent that it had awarded them loss of profits. See text supra at note 40. Since the parties articulate no disagreement with that court's apparent assumption that District of Columbia law governs, we proceed on the same assumption. See Tuxedo Contractors, Inc. v. Swindell-Dressler Co., 198 U.S.App.D.C. 426, 428-429, 613 F.2d 1159, 1161-1162 (1979), and cases there cited at notes 14, 16
 
 
 [42]
 Camalier & Buckley-Madison, Inc. v. Madison Hotel Inc., 168 U.S.App.D.C. 149, 162 n.93, 513 F.2d 407, 420 n.93 (1975); Brown v. Coates, 102 U.S.App.D.C. 300, 303, 253 F.2d 36, 39 (1958); Chesapeake & Potomac Tel. Co. v. Clay, 90 U.S.App.D.C. 206, 209, 194 F.2d 888, 891 (1952); cf. Minick v. Associates Inv. Co., 71 U.S.App.D.C. 367, 368, 110 F.2d 267, 268 (1940) (punitive damages never available, regardless of motive for breach); International Distrib. Co. v. American Dist. Tel. Co., 385 F.Supp. 871, 874 (D.D.C.1974) (same), aff'd in part and rev'd in part, 186 U.S.App.D.C. 305, 569 F.2d 136 (1977); Den v. Den, 222 A.2d 647, 648 (D.C.App.1966)
 
 
 [43]
 A plaintiff need only aver title or ownership in himself to support a cause of action for conversion. See, e. g., A & C Adjusters, Inc. v. Eastern Aquatics, Inc., 236 A.2d 440, 441 (D.C.App.1967); Hampton v. Stewart, 240 Ala. 2, 194 So. 509, 510 (1940); Scutt v. Bassett, 86 Cal.App.2d 373, 194 P.2d 781, 782 (1948); MacNeil v. Hazelton, 306 Mass. 366, 28 N.E.2d 477, 478 (1940). If the question of ownership is disputed, it becomes a jury question; see, e. g., Lauth v. Pickup, 64 F.2d 115, 116 (2d Cir. 1933); Giguere v. Morrisette, 142 Me. 95, 48 A.2d 257, 260 (1946) (court erred in directing verdict where ownership disputed), but here the claimants' ownership was undisputed. See text accompanying note 44 infra
 
 
 [44]
 R. A. Weaver & Assocs., Inc. v. Haas & Haynie Corp., supra note 35, at 5-6, J.App. 207-208 (emphasis in original)
 
 
 [45]
 Id. at 6, J.App. 208
 
 
 [46]
 Id
 
 
 [47]
 We have characterized this yardstick as "(t)he most distinctive feature of conversion." Pearson v. Dodd, 133 U.S.App.D.C. 279, 284, 410 F.2d 701, 706, cert. denied, 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969)
 
 
 [48]
 R. A. Weaver & Assocs., Inc. v. Haas & Haynie Corp., supra note 35, at 6, J.App. 208
 
 
 [49]
 Id. at 7, J.App. 209
 
 
 [50]
 J.App. 335
 
 
 [51]
 See Safer v. Perper, 186 U.S.App.D.C. 256, 261, 569 F.2d 87, 92 (1977) (applying Maryland law); Seaver v. Ransom, 224 N.Y. 233, 120 N.E. 639, 641 (1918); Mowrer v. Poirier & McLane Corp., 382 Pa. 2, 114 A.2d 88, 89 (1955)
 
 
 [52]
 True it is that supervising architects at times favored use of this slate. But only Walter E. Huber, the contracting officer, could approve its substitution for the slate originally specified, and that he never did
 
 
 [53]
 See text supra at notes 11-14. Approval of Nor Cashire slate for use in the project was clearly such a condition. See Brier v. Orenberg, 90 A.2d 832, 833 (D.C.Mun.App.1952) (condition precedent is a fact which must exist or occur before a duty of performance arises); Creighton v. Brown, 77 A.2d 559, 560 (D.C.Mun.App.1950)
 
 
 [54]
 R. A. Weaver & Assocs., Inc. v. Haas & Haynie Corp., supra note 35, at 9, J.App. 211. These observations were part of the court's elucidation of its ruling setting aside the jury's award of lost profits
 
 
 [55]
 See text infra at notes 57-59
 
 
 [56]
 See text infra at notes 60-66
 
 
 [57]
 Clayman v. Goodman Properties, Inc., 171 U.S.App.D.C. 88, 95 n.44, 518 F.2d 1026, 1033 n.44 (1973) (legal effect of contract omitting specification of time for performance is that it is to be performed within a reasonable time); Fox v. Johnson & Wimsatt, Inc., 75 U.S.App.D.C. 211, 217, 127 F.2d 729, 735 (1942) (rule of reasonableness generally controls when time not specified); Hartman v. Ruby, 16 App.D.C. 45, 58 (1900) (same)
 
 
 [58]
 See, e. g., American Concrete Steel Co. v. Hart, 285 F. 322, 327-328 (2d Cir. 1922); Bradford Novelty Co. v. Technomatic, Inc., 142 Conn. 166, 112 A.2d 214, 217 (1955); Hardin v. Eska Co., 256 Iowa 371, 127 N.W.2d 595, 597 (1964). The question whether the elapsed time was reasonable did not here depend on construction of the contract, see McGary v. Campbell, 245 S.W. 106, 115 (Tex.Civ.App.1922), nor was its duration such that divergent inferences could not fairly be drawn therefrom, see Morton v. Roanoke City Mills, Inc., 15 F.2d 545, 546 (4th Cir. 1926)
 
 
 [59]
 In its entirety, the court's charge on breach of contract was as follows:
 A breach of contract is a nonperformance without legal excuse of any contractual duty of immediate performance. A breach may be total, or it may be partial, and it may take place by the failure to perform acts promised, or by prevention or hindrance, or by repudiation.
 That, in general, is it.
 A contract may be breached in a number of different ways.
 It is a necessary implication of every contract containing promises binding each party that neither side, or neither party, will interfere or prevent performance by the other.
 If such prevention is caused by a party to the contract, the prevention is a breach, and the preventing party is then liable in damages to the other party, as I have defined the concept of damages.
 Tr. 601-602.
 
 
 [60]
 E. g., Lovell v. St. Louis Mut. Life Ins. Co., 111 U.S. 264, 274, 4 S.Ct. 390, 395, 28 L.Ed. 423, 426 (1884); United States v. Peck, 102 U.S. 64, 65-66, 26 L.Ed. 46, 47 (1880); Tradewell Foods, Inc. v. New York Credit Men's Adjustment Bureau, 179 F.2d 567, 568 (2d Cir. 1950); Stevens v. Howard D. Johnson Co., 181 F.2d 390, 393 (4th Cir. 1950); Gulf Oil Corp. v. American La. Pipe Line Co., 282 F.2d 401, 404 (6th Cir. 1960); Omaha Pub. Power Dist. v. Employers' Fire Ins. Co., 327 F.2d 912, 916 (8th Cir. 1964); Christensen v. Felton, 322 F.2d 323, 327 (9th Cir. 1963)
 
 
 [61]
 E. g., Entin v. City of Bristol, 368 F.2d 695, 701 (2d Cir. 1966); Vanadium Corp. of America v. Fidelity & Deposit Co., 159 F.2d 105, 108 (2d Cir. 1947); Miller v. Baum, 400 F.2d 176, 178 (5th Cir. 1968); Jordan v. Busch, 285 Ill.App. 217, 1 N.E.2d 745, 747 (1936); Odem Realty Co. v. Dyer, 242 Ky. 58, 45 S.W.2d 838, 840 (1932); Mehling v. Evening News Ass'n, 374 Mich. 349, 132 N.W.2d 25, 26 (1965); Parrish v. Wightman, 184 Va. 86, 34 S.E.2d 229, 232 (1945)
 
 
 [62]
 See cases cited supra notes 60-61
 
 
 [63]
 E. g., Bewick v. Mecham, 26 Cal.2d 92, 156 P.2d 757, 761 (1945); Foreman State Trust & Sav. Bank v. Tauber, 348 Ill. 280, 180 N.E. 827, 829-830 (1932); Barron v. Cain, 216 N.C. 282, 4 S.E.2d 618, 620 (1939)
 
 
 [64]
 E. g., Amies v. Wesnofske, 255 N.Y. 156, 174 N.E. 436, 438 (1931); Patterson v. Meyerhofer, 204 N.Y. 96, 97 N.E. 472, 473 (1912)
 
 
 [65]
 See, e. g., Hudson Canal Co. v. Pennsylvania Coal Co., 75 U.S. (8 Wall.) 276, 278, 19 L.Ed. 349, 351 (1869); Vanadium Corp. of America v. Fidelity & Deposit Co., supra note 61, 159 F.2d at 108; Alois v. Waldman, 219 Md. 369, 149 A.2d 406, 409 (1959); Beech Creek Coal Co. v. Jones, 262 S.W.2d 174, 176 (Ky.1953); Miller v. Othello Packers, Inc., 67 Wash.2d 842, 410 P.2d 33, 34 (1966). See generally Patterson, Constructive Conditions in Contracts, 42 Colum.L.Rev. 903, 928-942 (1942)
 
 
 [66]
 See, e. g., Restatement of Contracts § 295(a)-(b) (1932)
 
 
 [67]
 Much is already embedded in local jurisprudence. The prohibition against active interference is an implied contractual term. See Karrick v. Rosslyn Steel & Cement Co., 58 App.D.C. 89, 90-91, 25 F.2d 216, 217-218 (1928); Minmar Builders Inc. v. Beltway Excavators, Inc., 246 A.2d 784, 787 (D.C.App.1968); Matthew A. Welch & Sons, Inc. v. Bird, 193 A.2d 736, 738 (D.C.Mun.App.1963); Horlick v. Wright, 104 A.2d 825, 827 (D.C.Mun.App.1954). Thus, when the contract is bilateral, a promissor's hindrance or prevention of performance of the promisee's return promise ordinarily excuses the latter but leaves the promissor's contractual duties intact. Boomhower, Inc. v. Lavine, 151 F.Supp. 563, 578 (D.D.C.1957). This court has applied the interference doctrine in litigation presenting strictly nonfederal issues. Ammerman v. Miller, 159 U.S.App.D.C. 385, 394, 488 F.2d 1285, 1295 (1973). The question remaining open is whether interference and noncooperation stand on equal footing
 
 
 [68]
 See note 59 supra
 
 
 [69]
 Blake refused to submit the petition originally prepared by ISE and Weaver for GSA approval of Nor Cashire slate under the Buy American Act, and insisted that the petition be redrafted to emphasize domestic fabrication of the slate instead of the large cost saving from its use, a saving Blake may have had to refund to GSA. Tr. 120-125. Blake also, shortly before cancelling the contract, refused to press GSA for a final decision on use of Nor Cashire slate, Tr. 249, 265, perhaps again because of the specter of refund. We site these episodes merely as examples furnished by the evidence, and intimate no view on their value as such
 
 
 [70]
 E. g., Tuxedo Contractors, Inc. v. Swindell-Dressler Co., supra note 41, 198 U.S.App.D.C. at 428, 613 F.2d at 1161; Lee v. Flintkote Co., 193 U.S.App.D.C. 121, 124 & n.14, 593 F.2d 1275, 1278 & n.14 (1979)
 
 
 [71]
 See note 59 supra
 
 
 [72]
 The District Court will be at liberty to consider on remand the implied-promise theories discussed herein